# EXHIBIT 3

1 Dan K. Webb (admitted *pro hac vice*)
   dwebb@winston.com
2 WINSTON & STRAWN LLP
  35 W. Wacker Drive
3 Chicago, Illinois 60601-9703
  T/F: (312) 558-5600 / (312) 558-5700
4
5 Stephen R. Smerek (SBN 208343)
   ssmerek@winston.com
  WINSTON & STRAWN LLP
6 333 South Grand Ave., 38th Floor
  Los Angeles, CA 90071-1543
7 (213) 615-1700 / (213) 615-1750
8 Ekwan E. Rhow (SBN 174604)
   erhow@birdmarella.com
9 Hernan D. Vera (SBN 175149)
   hvera@birdmarella.com
10 Nithin Kumar (SBN 300607)
    nkumar@birdmarella.com
11 BIRD, MARELLA, BOXER, WOLPERT,
   NESSIM, DROOKS, LINCENBERG &
12 RHOW, P.C.
   1875 Century Park East, 23rd Floor
13 Los Angeles, CA 90067-2561
   T/F: (310) 201-2100 / (310) 201-2110
14
15 Ronald Richards (SBN 176246)
    ron@ronaldrichards.com
   LAW OFFICES OF RONALD RICHARDS
16  & ASSOCIATES, A.P.C.
   P.O. Box 11480
17 Beverly Hills, California 90213
   T/F: (310) 556-1001 / (310) 277-3325
18
   Attorney for Plaintiff Manuela Herzer
19
20              UNITED STATES DISTRICT COURT

21              CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MANUELA HERZER, an individual, | Case No.: 2:17-cv-07545-PSG (KSx) |
| Plaintiff, | DEMAND FOR JURY TRIAL |
| vs. | **FIRST AMENDED COMPLAINT** |
| | (1) Violations of the RICO Act |
| SHARI REDSTONE, an individual, and TYLER KORFF, an individual, | (2) Violations of the Electronic Communications Privacy Act |
| Defendants. | (3) Civil Conspiracy to Defame |
| | Action filed: October 9, 2017 |

Plaintiff Manuela Herzer ("Herzer"), by and through her undersigned counsel, alleges as follows:

## **INTRODUCTION**

1.     This lawsuit is about one of the most public and significant cases of parental and elder exploitation of all time, and involves the commission of numerous crimes by a daughter and grandson in pursuit of a corporate and family takeover of Sumner Redstone.  As alleged herein, their conduct constitutes violations of state and federal laws including the RICO Act and the Electronic Communications Privacy Act.

2.     Sumner Redstone – the 94-year-old billionaire media titan who owns CBS and Viacom – has fallen victim to a vengeful scheme orchestrated by his 63-year-old divorced daughter Shari Redstone to steal away his life and legacy in the final years of his life.

3.     The scheme orchestrated by Shari Redstone and her son Tyler Korff – both trained attorneys – was implemented to seize control of the two publicly traded companies that Sumner Redstone had acquired and built, CBS and Viacom.  Sumner Redstone had obtained these companies after the age of 50 and had made succession plans to ensure that they would be professionally managed and not operate as family-owned businesses.  To that end, he had appointed to management and the board of these companies independent non-family professionals to operate these businesses.  By doing so, Sumner Redstone sought to ensure that the long-term interests of CBS and Viacom and their respective shareholders were being properly and fairly served.

4.     Sumner Redstone's intentions for the governance of CBS and Viacom were publicly known for decades.  Consistent with this intent, he had further publicly announced adamantly on numerous occasions that Shari Redstone would never operate or control CBS and Viacom.  In fact, Shari Redstone's 20 percent minority ownership in these companies had not been granted by Sumner but instead had been acquired in 2002 pursuant to a divorce agreement between Sumner and his first wife, Phyllis Redstone, Shari's mother.  But despite Sumner's clear directive that these

FIRST AMENDED COMPLAINT

1 ==publicly-traded companies be properly and competently managed by outside==
2 ==professionals, Shari Redstone refused to accept her father's documented decisions and==
3 ==believed her bloodline entitled her to control his companies, contrary to Sumner's==
4 ==express desires.==

5      5.      Knowing that she could not obtain such control through legal means
6 given Sumner Redstone's opposition, Shari Redstone recruited her son Tyler Korff,
7 and resorted to illegal ones.  Starting on or before September 2014, when Sumner
8 suffered a series of health issues, Shari Redstone intentionally and cruelly capitalized
9 on her father's hospitalization to implement her scheme to unravel his long-standing
10 decisions and to ultimately take control of CBS and Viacom.

11      6.      To effectuate her plan to take over Sumner's life and his companies,
12 Shari Redstone sought first to isolate her father, then to systematically destroy the
13 historical relationships he had built over the course of decades with those he trusted
14 and who knew his true intentions and finally to take control of his corporate and
15 signatory authorities and take over his companies.  This lawsuit exposes the disturbing
16 criminal activities that Shari Redstone and her co-conspirators committed, and
17 continue to commit against her father and his long-time confidantes and business
18 associates to achieve these illegal ends.

19      7.      A significant component and ingredient of Shari Redstone's overall
20 scheme involved taking control of Sumner Redstone's personal life in addition to his
21 corporate powers.   The scheme involved secretly recruiting behind Sumner
22 Redstone's back family members, advisors and the household staff that worked at
23 Sumner's house.   Shari then later embedded her own attorneys masquerading as
24 Sumner's attorneys in a conflict-ridden joint representation.   With his diminishing
25 physical and communicative capacities, Shari Redstone and her co-conspirators
26 proceeded to exile those closest to Sumner – and especially plaintiff Manuela Herzer,
27 who, as Sumner's 20-year friend and confidante whom Sumner considered family and
28 entrusted with his healthcare directive was by his side, at his request.  This involved,

among other crimes, bribing the household staff and then collecting and strategically using private information to cause distrust and destroy Sumner's long-term relationships with those that he trusted – at the expense of Sumner who suffered severe emotional distress at his weakest moment.

8.    Shari Redstone's cruel scheme also involved invalidating the clear directives Sumner Redstone had communicated and documented over many years with his attorneys for both his business and his personal affairs.  Again, one of these clear directives was that Shari Redstone and other family members would respect Sumner's business and personal wishes.   Sumner and the Board of Viacom had already attempted to excise Shari Redstone by buying out her shares – first in 2007 and then in 2014.  Such a buy-out would have fully realized Sumner's long-standing desire to protect the shareholders of his companies and ensure that they remained professionally managed and free from undue family influence.

9.    Despite the fact that this buyout – the last worth almost one billion dollars – would have ensured that Shari Redstone would live comfortably the rest of her life, she refused to accept it as the amount was never enough.  In a September 30, 2014 email to Tyler Korff, Shari Redstone wrote: "*[ W]hy would I ever give [Sumner] his dying wish of peace when he never gave me any peace during my whole life . . .Going after these [women] will give me peace[.]*"

10.    While delaying and ultimately refusing the buy-out deal, Shari Redstone, her son Tyler Korff, her personal attorney Elizabeth Burnett, and others continued to break the law and do whatever necessary to take control of Sumner's life. As part of their scheme, Shari Redstone and Tyler Korff continued to secretly and literally infiltrate Sumner's home by causing the household staff to serve as their informants and to steal private information regarding the activities of Sumner and those around him.  The nurses and household staff continuously intercepted private documents and communications, made illicit recordings of meetings between Sumner, his attorneys and others and then passed the acquired information to Shari Redstone, Tyler Korff

3

1  and Elizabeth Burnett while fully aware that they were breaking the law and violating

2  the strict confidentiality agreements Sumner's household staff had signed as

3  conditions of their employment.  These communications even included private and

4  inside information relating to the buy-out deal involving Shari Redstone's Viacom

5  shares which allowed her to secretly and unlawfully eavesdrop on both sides of the

6  deal in violation of federal law.

7        11.     Shari Redstone and Tyler Korff also used the nurses and the household

8  staff to mount a vicious campaign of misinformation, propaganda and lies to attack

9  and eliminate those with whom Sumner had close personal relationships, starting with

10  plaintiff Manuela Herzer.  By doing so, they callously sought to destroy Sumner's life

11  causing him emotional distress and take advantage of a mentally diminished Sumner

12  for their own personal gain.  Acting at Shari Redstone and Tyler Korff's direction,

13  Sumner's nurses and household staff lied, pressured and led a vulnerable and confused

14  Sumner to believe that Manuela Herzer did not care for him and needed to be evicted

15  from Sumner's home and banished from his life – despite their 20-year friendship and

16  the fact that Herzer had been serving as his appointed agent on his Advanced

17  Healthcare Directive and Power of Attorney.  After displacing confidantes such as

18  Herzer, Shari Redstone intended to and did replace them with hand-picked co-

19  conspirators to further her goal of a complete family and corporate takeover.  To harm,

20  embarrass, and knowingly put at risk Manuela Herzer and her children, Shari

21  Redstone and Tyler Korff also hired media consultants and others to help create a

22  false narrative about Manuela Herzer and her immediate and extended family, and to

23  propagate the spread of false information through the press.

24        12.     The illegal and vicious eviction of Manuela Herzer was implemented on

25  October 12, 2015 by Shari Redstone, Tyler Korff and her co-conspirators including

26  the household staff.  Herzer had been living in Mr. Redstone's home since April of

27  2014 while her home was under construction.  His residence was her primary

28  residence.  On that day, using stolen private information of Sumner and Manuela

Herzer and after illegally accessing her personal computer, cell phone and private documents, Shari Redstone and Tyler Korff caused an armed guard to forcibly remove Manuela Herzer from Sumner's house where she had been living and helping take care of Sumner. Shari Redstone, Tyler Korff and her co-conspirators have continued to victimize Manuela Herzer and her family to this day.

13. With Sumner now unprotected, emotionally distressed and isolated, Shari Redstone and Tyler Korff – with a phalanx of attorneys and other paid professionals – invaded his residence within hours and began preparing documents that would result in drastic changes to the governance of his media companies, his Advance Healthcare Directive and his estate plan. Shari Redstone and Tyler Korff literally unwound in a few days clear directives that Sumner had maintained in place for decades. And the upshot of these maneuvers was that Sumner became even further separated from those who he had depended on and trusted. Knowing that Shari's actions were entirely inconsistent with his long-time directives to separate his family from corporate control and to protect those in his estate plan, Shari Redstone directed the professionals and other third parties that she had bribed to falsely claim that Sumner had approved of these acts, even though they could not communicate with him. To this day, there is no independent evidence that these were Sumner's wishes. These actions completely contradict who Sumner Redstone is.

14. To the contrary, there is evidence that these are not Sumner Redstone's wishes. After personally examining Sumner in January 2016, Dr. Stephen L. Reed – a well-respected geriatric psychiatrist who teaches at UCLA medical school – testified that, in his professional opinion, Sumner suffered from moderate dementia and "lacked the mental capacity to make a change in his appointed health care agent." Dr. Read described Sumner as a "very, very thin shadow of what he was" and testified that "[i]t was very sad to see how much he didn't understand about his life."

15. With unfettered access to a weakened Sumner, Shari Redstone has kept Sumner a hostage in his own home and prevented him from meeting with anyone

FIRST AMENDED COMPLAINT

1   other than those vetted by her – even to the present. Without explanation, Sumner –

2   through Shari Redstone – has purportedly and suddenly refused to take visitors. And

3   despite formal requests from his long-time friends and board members of CBS and

4   Viacom asking for face-to-face meetings to confirm his intentions, Shari Redstone

5   has refused to allow such meetings. All the while, Shari Redstone continued to

6   fraudulently reverse the measures Sumner had his attorneys and executives put into

7   to place specifically for the purpose of protecting himself, others and his media empire.

8   Indeed, Shari Redstone admitted as much in an email to her son and co-conspirator

9   Tyler Korff on October 15, 2015, shortly after illegally evicting Manuela Herzer, in

10   which Shari wrote, "*[I]t would be good if we could get him to undue [sic] all of the*

11   *legal documents, letters and affidavits that he has done against me.*"

12         16.   To further her scheme and given that Sumner was still alive, Shari

13   Redstone also needed to create the public appearance that Sumner approved of her

14   conduct. To achieve this, Shari implemented perhaps the most sinister part of her

15   plan: making an incapacitated Sumner a puppet for her scheme. Capitalizing on

16   Sumner's lack of capacity and his inability to communicate, she monopolized access

17   to him and hand-picked conflict-ridden attorneys to represent both him and her.

18   Except for an orchestrated 15 minute deposition on May 6, 2016, where a completely

19   incoherent Sumner purportedly communicated through grunts (and, which upon a

20   forensic analysis which has been denied until today, will be shown to be a fraud),

21   Sumner has never been seen by any third parties and has never been seen in public at

22   all. He has not spoken on the phone or otherwise communicated personally with

23   anyone, other than those vetted and controlled by Shari Redstone.

24         17.   Purportedly in Sumner's name – which was impossible given his

25   physical and mental condition – through emails which he did not author and

26   documents he could not have understood, signed or approved, Shari Redstone and the

27   attorneys that she was now directing began preparing documents that she fraudulently

28   represented had been dictated by Sumner. Shari Redstone directed her co-

FIRST AMENDED COMPLAINT

1   conspirators, including nurses, Jeremy Jagiello and Joseph Octaviano, to witness the

2   signing of these documents in case she needed them to later falsely attest that Sumner

3   had understood or authorized its contents. Shari Redstone would also cause such

4   documents to be sent to and used by the lawyers and media consultants she hired on

5   Sumner's behalf, some of whom have never met or communicated with Sumner.

6   Once again, with no third party available to verify whether these were authentic

7   communications, Shari Redstone used Sumner as an incapacitated puppet to literally

8   manipulate every aspect of CBS and Viacom.

9        18.   To wit, on December 11, 2015, Shari Redstone prepared a two-page

10   completely fabricated letter addressed to herself and purportedly from Sumner, and

11   then sent the letter to Sumner's attorney Leah Bishop. The fraudulent letter falsely

12   represented that Sumner's thoughts, feelings and expectations were memorialized in

13   the letter. In fact, Shari had authored the letter herself without input from Sumner,

14   read the letter to Sumner, and then interpreted Sumner's grunts as approval and

15   authorization for everything that she had written. The falsified letter stated that it was

16   Sumner's "intention that you succeed me as the non-executive Chair of the Boards of

17   Directors of Viacom and CBS after my death," directly contradicting clear statements

18   to the contrary Sumner had made over decades. Shari Redstone had herself admitted

19   to Tyler Korff just months earlier that Sumner vehemently opposed her intention to

20   succeed him, writing in an email dated July 29, 2015, "***your grandfather says I will***

21   ***be chair over his dead body.***"

22        19.   Despite numerous requests from Viacom directors for independent

23   verification from Sumner regarding this fraudulent letter and others like it, Shari

24   Redstone consistently caused those requests to be denied. To this day, Sumner has

25   never verified that this letter was written by him.

26        20.   Shari Redstone furthered this aspect of her scheme through attorneys

27   she choose and directed. For example, on May 20, 2016, Michael Tu of Orrick

28   Herrington, an attorney that Sumner had no prior relationship with issued a shocking

FIRST AMENDED COMPLAINT

lengthy statement contending that Sumner had asked him to make changes to the governance of both his media empire and estate plan. Plans that Sumner had meticulously put in place with his personal attorney of almost fifty years were all reversed by an attorney who could not even verify he had ever met or spoken to Sumner. The statement contended that Sumner wanted several of his closest business partners and longtime friends to immediately resign from their positions at Viacom and as trustees of Sumner's trust – positions they had both held for decades. One of the fabricated reasons for these removals, was that Sumner was unhappy with Viacom's performance and stock price. (Since Shari has interfered and taken over, the stock price has dropped from $49.79 a share on Nov. 1, 2015 to $32.53 today.) These individuals never had the opportunity to see or speak with Sumner personally before or after these decisions were purportedly made. When Sumner's ousted business associates sought to personally meet with Sumner to ensure that these were in fact his decisions, they were again told by Shari Redstone that Sumner did not want to meet, or speak with them.

21. In reality, having co-opted Sumner's decision-making capabilities, Shari Redstone using conflict-ridden attorneys prepared these purported statements to eliminate from Sumner's life those whom she knew would attempt to challenge her, and then replaced the ousted board members and trustees with her allies. Among them included Shari Redstone's daughter Kimberlee Ostheimer and close friend Jill Krutick. As a result of these appointments as trustees of the irrevocable trust that will control Sumner's companies after his death, Shari Redstone effectively gained complete control over the fate of his personal and entire media empire.

22. While completing her corporate takeover of Sumner's publicly traded companies with no accountability, Shari Redstone was concurrently taking over his personal wealth to further distance Sumner from those closest to him. Bequests Sumner had made to numerous individuals, including Manuela Herzer and her children, which aligned with Sumner's long-time documented wishes, were suddenly

8

1  deleted from his estate plan.  Those that had pledged allegiance to Shari's interests

2  were concurrently added.  And Shari is now using his wealth to pay her hand-picked

3  attorneys to litigate against Sumner's friends and business associates and to pay off

4  all of her bribes.  To this day, Sumner – who is now completely isolated – has never

5  independently or directly confirmed in person that these were his actual intentions.

6      23.    The end result is that Sumner has been separated entirely from those

7  closest to him.  Since October 2015, when Shari usurped control of Sumner's life, the

8  following long-time confidantes, friends and business associates of Sumner have been

9  entirely cut out of CBS, Viacom, Sumner's life and his succession plans:

10  • Philippe Dauman – CEO and executive chairman of Viacom, a company

11     Dauman had helped Sumner acquire in the 1980s; a trustee of Sumner's two

12     irrevocable trusts; and his business partner and friend of over thirty years,

13     whom Sumner publicly and privately called "a son" – has been removed

14     from each of these positions and, only after being paid over $90 million,

15     ended his objections to Shari's unlawful takeover.  In his lawsuit and also

16     in a more recent deposition, Dauman characterized Shari's actions as "a

17     corporate takeover."

18  • Manuela Herzer – who changed her life to take care of Sumner at his request

19     and  Sumner's longtime friend and confidante of twenty years, whom

20     Sumner considered family –  has been illegally evicted from Sumner's life,

21     cut out of his estate plan entirely, removed from her position as Sumner's

22     designated health care agent and power of attorney, and prevented from ever

23     seeing Sumner again.

24  • George Abrams – Sumner's longtime business partner and friend of fifty

25     years – has been removed from his positions as a trustee of one of Sumner's

26     irrevocable trusts and as a director of Viacom, a role Sumner had entrusted

27     to Abrams for thirty years.  He too sued and was then bought off.

28  • Frederic Salerno – a distinguished executive who has served as directors of

9

several public companies, including CBS and Viacom – has been removed from his position as the lead independent director of Viacom, a position that Salerno was first chosen for in 1994. Like Dauman and Abrams, Salerno sued Shari and was subsequently bought off.

- Keryn Redstone – Sumner's granddaughter – was removed from Sumner's estate plan by Shari, and was also removed from the title of a home in Los Angeles that Sumner had recently purchased for Keryn through a trust. Keryn was prevented from even seeing Sumner for almost a year by Shari, until a Boston judge ordered that Keryn be allowed to see her grandfather, and review her part of Sumner's trust. After this visit Keryn reported that Sumner did not recognize her, and was a shell of his former self. In violation of federal witness tampering and witness bribery laws, Shari Redstone threatened and bought off Keryn to influence her to recant prior sworn testimony asserting that Shari Redstone had illegally seized control of Sumner's life and illegally evict Manuela Herzer.

24.     With Sumner nowhere to be found or seen or heard from, and his allies banished from the positions Sumner had appointed them to and then bribed to stay silent, Shari Redstone achieved what Viacom's now-former President, CEO and Chairman Philippe Dauman called a "corporate takeover" in his lawsuit filed in Massachusetts, and again in a recent deposition. The actions filed by Dauman and others all contain strikingly similar allegations which a Massachusetts probate court deemed plausible in August 2016 in a 76-page opinion.

25.     In addition to eliminating her enemies and those closest to Sumner by threats and bribes, another component of Shari Redstone's scheme has been her initiation of a lawsuit against Manuela Herzer, purportedly in Sumner's name. The lawsuit was filed by Shari's personal attorney Robert Klieger, who, after purportedly serving as Sumner's personal lawyer for a little over a year, was elected to the CBS board by Shari. His joint representation of Sumner and Shari Redstone is a conflicted

FIRST AMENDED COMPLAINT

one that has coopted Manuela Herzer's privileged and confidential information and is only further evidence of Shari's underlying conspiracy and crimes. Shari's scheme also included having her personal attorneys filing other fraudulent, baseless and unfounded lawsuits in Sumner's name causing Manuela Herzer substantial financial loss and emotional distress. While Shari and her co-conspirators have had no financial or personal burden funding these lawsuits, because they are using a mentally incapacitated Sumner's personal wealth, Herzer is being forced to expend substantial sums to defend herself. The irony of this is that Sumner, who had confirmed through legal document after legal document with his attorneys that he wanted Manuela Herzer and others protected from Shari Redstone, is now unknowingly using the full force of his wealth to unlawfully threaten and sue these same individuals with fraudulent lawsuits and to protect Shari's illicit conspiracy.

26.  Defendant Shari Redstone – along with her family members (including Defendant Tyler Korff, Brandon Korff, Kimberlee Ostheimer and Jason Ostheimer), members of Sumner's nursing and household staff (including but not limited to Jeremy Jagiello, Joseph Octaviano, Isileli Tuanaki, Faleolo Toia, Igor Franco and Gloria Mazzeo), and Shari Redstone's attorneys and spokespersons – formed an association-in-fact enterprise.

27.  The common purpose of the enterprise described above, which continues to function today, has been to eliminate from Sumner's life his friends, companions and business associates that have surrounded him for decades as a direct means of gaining control of Sumner's estate plan and media companies, including NAI, CBS and Viacom.

28.  Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1)(A) and 18 U.S.C. § 1961(5) by multiple related and continuous predicate acts of (i) commercial bribery in violation of California Penal Code § 641.3, (ii) mail fraud in violation of 18 U.S.C. § 1341, (iii) wire fraud in violation of 18 U.S.C. § 1343, (iv) witness bribery in violation of 18 U.S.C. § 201,

1   and (v) witness tampering in violation of 18 U.S.C. § 1512.

2        29.    The acts of defendants Shari Redstone and Tyler Korff constitute an

3   illegal pattern of racketeering in violation of the Racketeer Influenced and Corrupt

4   Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*  In addition, Defendants'

5   conduct constitutes violations of the Electronic Communications Privacy Act

6   ("ECPA"), 18 U.S.C. § 2510 *et seq.*, as well as violations of state law.

7        30.    By this litigation, Manuela Herzer seeks compensatory damages in an

8   amount no less than $100 million, as well as treble and punitive damages under RICO

9   and attorney's fees under ECPA.  Moreover, because of the malicious and despicable

10   nature of defendants' conduct, Manuela Herzer is entitled to punitive damages,

11   attorney's fees and the disgorgement of profits.

12   <div align="center">**<u>JURISDICTION AND VENUE</u>**</div>

13        31.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331,

14   1337(a) and 18 U.S.C. §§ 1964, 2511 because this case arises under the laws of the

15   United States based on claims for relief for violations of RICO and ECPA.

16        32.    This Court may exercise supplemental jurisdiction over the state law

17   claim pursuant to 28 U.S.C. § 1367(a) because the state and federal claims derive

18   from a common nucleus of operative facts and form part of the same case or

19   controversy.

20        33.    This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332

21   based on the citizenship of the parties and the amount in controversy, which exceeds

22   $75,000.

23        34.    This Court has personal jurisdiction over Defendants Shari Redstone and

24   Tyler Korff by virtue of their continuous and systematic contacts with this forum as

25   well as their specific contacts with this forum that give rise to the claims here asserted.

26        35.    Venue is proper under 18 U.S.C. § 1965 because Plaintiff Manuela

27   Herzer is a resident in this District and under 28 U.S.C. § 1391 because a substantial

28   part of the events giving rise to the claims occurred in this District.

<div align="center">12</div>

<u>**THE PARTIES**</u>

36.     Plaintiff Manuela Herzer is an individual residing in Los Angeles, California.

37.     Defendant Shari Redstone is an individual residing in Boston, Massachusetts and New York, New York, and is the daughter of Sumner Redstone. She is also a former member of the State Bar of Massachusetts.  Shari Redstone was admitted to the Massachusetts bar on December 21, 1978 and is currently inactive. She lists a member address in Norwood, Massachusetts.

38.     Defendant Tyler Korff is an individual residing in New York, New York and is the son of Shari Redstone.  Tyler is an active member of the state bars of Massachusetts and New York.  Korff was admitted to the New York bar on June 17, 2013, bar #5143946.  Korff was admitted to the Massachusetts bar on November 28, 2012, license #685269.

<u>**FACTUAL ALLEGATIONS**</u>

**A.     Sumner Redstone Builds a Vast Media Empire and Then Takes Steps to Protect His Legacy.**

39.     Sumner Redstone is the controlling shareholder of National Amusements, Inc. ("NAI"), a privately-owned theater company based in Massachusetts that was founded by Sumner's father in 1936.  Under Sumner's leadership, NAI grew into a large, prosperous business and brought some of the world's largest entertainment companies under its corporate umbrella, including CBS, Viacom, Paramount Pictures and various television networks including BET, CMT, MTV, Nickelodeon, VHI, Comedy Central, Spike and TV Land to name just a few.

40.     Sumner ultimately developed an estate plan that would empower his trusted business associates and professionals - rather than family members who did not share his business acumen - to control and manage NAI, Viacom and CBS for the benefit of the public stockholders of Viacom and CBS.  Although Sumner could have planned for this transfer of his remaining interests in NAI to his children outright,

13

1    Sumner intentionally chose not to do so.

2        41.    Instead, decades ago, Sumner developed an estate plan whereby he

3    transferred his interests in NAI into a trust known as the Sumner M. Redstone

4    National Amusements Trust ("NAI Trust"), of which he is the sole beneficiary during

5    his lifetime.  The NAI Trust granted Sumner "the sole and exclusive power to vote

6    any Stock held by the Trust," and in the event of Sumner's death or incapacity, the

7    trust instrument provides that its seven trustees, by majority vote, shall direct how to

8    vote the shares of NAI.  Thus, the trustees will eventually hold effective control over

9    Sumner's entire media empire.

10       42.    Sumner designed the NAI Trust so that his children would not have

11   control of the shares held by the Trust. In particular; Sumner designed the Trust so

12   that "from the date of [his] death [or incapacity] . . . there shall be seven (7) Trustees":

13   two personal Trustees and five disinterested Trustees.

14       43.    Consistent with his plan for disinterested and professional oversight of

15   his companies, Sumner named among the trustees of the NAI Trust the following

16   individuals:  George Abrams, a fellow Harvard Law School graduate who served his

17   lawyer and has been Sumner's friend for over 50 years; David Andelman, a longtime

18   CBS director and Sumner's personal estate planning lawyer; and Philippe Dauman,

19   the corporate lawyer who was instrumental in Sumner's acquisition of Viacom,

20   Paramount and CBS, and the man who Sumner treated like a son.  By all accounts,

21   Sumner had been grooming Dauman to be his eventual successor, not Shari Redstone.

22       44.    Through careful planning overseen by disinterested business associates

23   and attorneys close to him, Sumner used NAI Trust to ensure that his children, and in

24   particular Shari Redstone, could not obtain control of the shares of the Trust and could

25   not seize control of Sumner's media empire.

26   **B.    Sumner and Estranged Family Members Have Feuded Publicly For**

27          **Decades Over Power, Money and Succession Plans for His Companies.**

28       45.    Sumner's relationship with his daughter Shari Redstone and other

members of his family has been riddled with conflict for decades. That conflict has been driven in large part by the unbridled ambition of Shari and Sumner's other relatives to gain greater control of his media empire.

46. In fact, Sumner never intended for Shari Redstone to own any interest in NAI. She obtained her interest by virtue of a 2002 divorce agreement with Shari's mother and not as a voluntary grant by Sumner. Sumner has also fought other family members who attempted to interfere in NAI. In 2006, Sumner and his company National Amusements, Inc. were sued by Shari's brother, Brent Redstone, based on accusations that Sumner had failed to provide him with adequate information about NAI's business dealings. Sumner settled the case by buying out Brent's interest in NAI for $250 million, and since then, Brent and Sumner have ceased communicating with each other altogether. As a result, Sumner today owns an 80% controlling interest in NAI while Shari Redstone owns the remaining 20% minority interest.

47. Sumner and NAI were also sued in 2006 by Sumner's nephew, Michael Redstone, for alleged self-dealing. Sumner won the case against Michael in 2009 after a four-day trial in Massachusetts concerning whether Sumner's father had intended to create an oral trust in Michael's favor in 1959.

48. The battle between Sumner and Shari Redstone has become the most notorious of the Redstone family's disputes, especially due to its very public nature. At one point, the media reported that they were only communicating by fax and were refusing to speak with each other in person. Sumner and Shari Redstone have had an especially troubled relationship, in part due to Sumner's desires to keep her away from his personal and business affairs. On countless occasions, Sumner expressed to his attorneys and his friends, including Manuela Herzer – and regularly to the public media – strong, negative feelings about his daughter.

49. The tension between Shari and Sumner erupted publicly in 2007 after Shari Redstone voted to block a $105 million charitable gift that Sumner wanted to make to hospital systems in Massachusetts and California. The NAI board of

1     directors approved the donation, but Shari, alone among the five other members of

2     the board, voted against the gift.  In an interview with *Forbes* that was partially

3     published in October 2007, vexed and embarrassed by his daughter's public betrayal,

4     Sumner explained that "[s]he insisted on dissenting."

5         50.     Sumner soon began making clear through public statements that he did

6     not want Shari Redstone to exert influence over Viacom or CBS or to replace him as

7     the head of Viacom or CBS. Over the better course of a decade and in the months

8     leading up to Shari's corporate takeover, Sumner made clear and Shari understood

9     that he did not want her to have control over NAI, Viacom or CBS.  To wit:

10       •     On February 8, 2007, Sumner wrote a letter to the trustees of the NAI

11           Trust stating that "***Shari does not have the requisite business judgment***

12           ***and abilities to serve as chairman of the three companies.***"

13       •     On July 20, 2007, Sumner faxed a harshly-worded letter to *Forbes*

14           rejecting Shari's ambitions to become his successor as the chairperson

15           of Viacom and CBS.  "***While my daughter talks of good governance,***

16           ***she apparently ignores the cardinal rule of good governance that the***

17           ***boards of the two public companies, Viacom and CBS, should select***

18           ***my successor.***" Sumner further wrote, "It must be remembered that I

19           gave to my children their stock; and it is I with little or no contribution

20           on their part, who built these great media companies with the help of the

21           boards of both companies."

22       •     Sumner issued a clear warning to Shari in his 2007 interview with *Forbes*

23           that "***[i]f she insists on trying to succeed me, there's no question the***

24           ***boards will do what I ask them.  They've never gone against my***

25           ***wishes.***"

26       •     On September 29, 2014, Sumner wrote a letter to his attorney Andelman

27           stating "***Recent dealings with my daughter, Shari, have caused me to***

28           ***believe even more strongly that she does not have the requisite business***

FIRST AMENDED COMPLAINT

1                    ***judgment and abilities to serve as Chair of Viacom or CBS.***"

2        51.     On two occasions – in 2007 and 2014 – Sumner Redstone even attempted

3 to buy Shari Redstone out of her shares removing any residual influence she might

4 have over his companies. In or around July 2007, Sumner proposed a spin-off

5 transaction to extricate her from his companies. Shari Redstone would give up her

6 20% interest in NAI and leave the boards of CBS and Viacom in exchange for

7 monetary compensation and 100% control of NAI's subsidiary movie theater chain

8 business which would be spun off as a new company. An associate of Sumner's told

9 the *Los Angeles Times* at the time that, "[t]his [deal] is about Sumner not giving up

10 control. It doesn't matter if he's related to you or not." In response, Shari Redstone

11 hired attorneys, threatened to take legal action against her father, and ultimately

12 rejected Sumner's offer.

13        52.     As late as January 2015, Sumner again offered to buy out Shari

14 Redstone's shares, hoping to permanently remove her from his business affairs and

15 prevent her from reversing his documented intentions that his media empire not fall

16 into her hands after his death. Shari Redstone fully understood that Sumner's

17 intentions were to prevent her from having any influence over his companies. Just

18 months after this offer was made, on July 29, 2015, Shari Redstone acknowledged to

19 Tyler Korff after an in-person meeting with Sumner that "***your grandfather says I***

20 ***will be chair[woman] over his dead body.***"

21        53.     But Shari Redstone again rejected the proposed transaction and refused

22 to give up the possibility of gaining control of Viacom and CBS after her father's

23 passing. Shari's ultimate goal remained the same: to take full control of CBS,

24 Viacom and the media empire built by her father, irrespective of his wishes.

25 **C.**     **Sumner Develops an Inner Circle of Friends and Business Associates,**

26         **Including Manuela Herzer and Her Family.**

27        54.     In contrast to his contentious relationship with Shari Redstone, Sumner

28 enjoyed close and trusting relationships with long-time friends such as Manuela

Herzer, Phillippe Dauman, George Abrams and Fred Salerno. Sumner respected each of these individuals for their business acumen and, given his confidence in their business abilities and character, Dauman, Abrams and Salerno served as trustees of NAI and directors of Viacom. Sumner had particular confidence in Dauman who served as CEO and Executive Chairman of Viacom and who was his hand-picked successor.

55. Sumner also entrusted Manuela Herzer with his most sensitive and important personal issues. Herzer was a devoted and busy mother of three when she met Sumner at a dinner party in Los Angeles in 1999. At the time, Sumner was going through a divorce and was the Executive Chairman of Viacom. Herzer and Sumner dated for a short period of time but then ended their relationship. The two have remained close platonic friends ever since. Sumner and Herzer routinely confided in each other regarding personal and professional matters.

56. Sumner was also an important figure in the lives of Manuela Herzer's children, whom he had known from a very young age. In a statement he gave to *Vanity Fair* for an article published in June 2015, Sumner said, "*I have known Manuela for over 20 years. She and her children are family to me.*" In 2012, Sumner attended and sat in the front row of the college graduation of Herzer's son Bryan, and in 2013, Sumner flew to New York with Herzer's daughter Kathrine to proudly accompany her to her first day at a new job. During this period, Herzer and Sumner were constantly at each other's side and supported each other professionally and personally.

57. Consistent with how he treated the many individuals he cared about, including family members, former wives, charities and his loyal employees, Sumner instructed his attorneys to ensure that the various iterations of his eponymous personal trust (the "SMR Trust") made provisions for the care and protection of Herzer and her family and that any *inter vivos* gifts were properly documented to protect them from attack by Shari Redstone or others.

58.     Starting in 2011, Sumner named Manuela Herzer as a beneficiary in his personal trust. In the trust document, he noted that Herzer was "family" – memorializing the close relationship that Sumner and Herzer had shared for so many wonderful years. Importantly, as clear evidence of the trust he had for her, Herzer was also named as a successor trustee of Summer's personal trust, a position she held until the trust documents were amended in October 2015, just two days after she was evicted from Sumner's home.

59.     For each of the bequests made to Manuela Herzer, Sumner – who was fully in control of his mental facilities and able to communicate directly on his own – made his intentions clear by having the amendments to the SMR Trust drafted, reviewed, vetted, approved, and signed first by David Andelman, Sumner's personal attorney and co-trustee of his trust, Leah Bishop, Sumner's estate lawyer, and the other co-trustee Philippe Dauman, the then-president and CEO of Viacom. These various attorneys and advisors ensured that the gifts were valid and fully consistent with Sumner's wishes and verified that the gifts were not the product of undue influence.

60.     In early 2013, as Manuela Herzer's personal residence was being renovated, Sumner even invited her family to stay at his Beverly Hills estate. Between April 2013 and October 2015, Herzer played a vital role in the management of Sumner's home-based health care by coordinating and supervising the staff who resided at his home and working closely with Sumner's personal physician, Dr. Richard Gold. Herzer made numerous improvements to Sumner's health care arrangements, personally tended to his comfort and medical needs, scheduled his medical and therapy appointments, and implemented a system of around-the-clock care by Sumner's household and nursing staff that impressed his friends such as Dauman.

61.     In May 2014, with his lawyers and doctors present as witnesses, Sumner even executed an Advance Health Care Directive designating Manuela Herzer as his

19

co-agent authorized with power of attorney to make health care decisions on his behalf. Indicative of high esteem that Sumner held for Herzer, the only co-agents as of October 2015 were Herzer and Dauman – not Shari Redstone or any other family members.

62. In June 2015, Summer prepared and signed his funeral and burial instructions, which provided that his then girlfriend Sydney Holland ("Holland") and Manuela Herzer were to make the guest list for the private service and choose the person to officiate at the service. Herzer and Holland were also to select the grave marker, make the public notification of his death, and arrange the reception following the funeral. Sumner wished for Herzer's son, Bryan, to be one of the pallbearers and for her daughters, Christina and Kathrine, along with his grandchildren, to recite prayers or poems of their choice at the service. The instructions also provided that if his estranged daughter, Shari Redstone, contested his estate plan, the family cemetery plots held in his name were to be given to Holland and Herzer.

**D.      Sumner Falls Gravely Ill and Loses the Ability to Communicate.**

63. In September 2014, Sumner began experiencing a dramatic decline in his health. He had a feeding tube inserted in his abdomen and has not been able to eat food ever since. He began to require around-the-clock nursing care, and now has nurses and aides in attendance at all times.

64. Sumner can no longer stand, walk or coherently communicate. He can no longer read or write. He has lost the ability to swallow and requires a feeding tube in order to eat or drink. He also requires suctioning of phlegm and saliva multiple times during the day and at night in order to avoid serious breathing complications.

65. After examining Sumner in person, a medical doctor specializing in geriatric psychiatry testified in a May 2016 trial concerning whether Manuela Herzer had been improperly removed from Sumner's advanced health care directive that Sumner was suffering from a "major neurocognitive disorder" and dementia "toward the severe end of moderate." As a result, the doctor testified that Sumner was "unable

1   to evaluate the things that are around him" and could not identify simples shapes or

2   do simple arithmetic. The doctor further testified that Sumner's "ability to detect

3   fraud is very impaired," and that he had become "completely dependent on a range of

4   people around him."

5       66.    Sumner's declining physical health in 2014 and into 2015 gave Shari

6   Redstone the opportunity to undermine Sumner's longstanding wishes set forth in his

7   comprehensive estate planning and his publicly-documented intention that NAI,

8   Viacom and CBS continue to be independently controlled and professionally

9   managed when he was no longer capable of doing so. Knowing that Sumner would

10  be increasingly susceptible to manipulation and deception, she and her son Tyler

11  Korff implemented their plan to take over his life and then his companies.

12  **E.**    **Shari Redstone and Her Family Criminally Conspire to Remove**

13      **Manuela Herzer and Gain Control of Sumner's Estate Plan and Media**

14      **Companies.**

15      67.    Shari Redstone and Tyler Korff's scheme involved first taking over

16  Sumner's household. By bribing Sumner's nurses and household staff to illicitly

17  gather information from inside Sumner's residence, Shari Redstone and Tyler Korff

18  collected private information that could be used against Sumner and those closest to

19  him. With the help of her children, her attorneys and her media consultants, the two

20  then manipulated this information to turn others, and eventually Sumner himself,

21  against those who sought to protect Sumner's best interests, including Manuela

22  Herzer.

23      68.    Upon taking control of the household, Sumner's healthcare, and his

24  attorneys who were also her attorneys, Shari Redstone could then literally control

25  whatever Sumner said, as he no longer could communicate upon his own and would

26  ultimately become incapacitated. By doing so, Shari Redstone could then control

27  what Sumner he signed and how he used his ownership in NAI. As the evidence will

28  show, Shari Redstone ultimately sent or caused to be sent fraudulent communications

purporting to have been sent and approved by Sumner that transferred all of Sumner's decision-making power to Shari and appointed her as President of NAI and Vice-Chairwoman of Viacom – thereby giving her full power and effecting a complete corporate takeover of his companies.

69.     The timeline of events starting from the time period just before Sumner's hospitalization in 2014 reveals Shari Redstone's improper intent and pattern of conduct that led to this corporate takeover.

70.     In September 2014, around the time of his illness, Sumner asked his attorneys to re-start negotiations with Shari Redstone to spin off her 20% ownership interest in NAI for $1 billion.  Sumner's offer was substantially similar to the spin-off transaction he previously proposed to Shari in mid-2007.  This time, however, Sumner also insisted that Shari Redstone and her family members sign releases and promise not to sue Manuela Herzer.

71.     At that time, Shari Redstone knew that a fully competent Sumner trusted and was close with Manuela Herzer.  And Shari Redstone also knew that, conversely, Sumner did not have the same affinity toward her.  In a June 3, 2014 email to several people, including her three children, Sumner's lawyers David Andelman and Leah Bishop, and Sumner's ex-wife and Shari's mother Phyllis Redstone, Shari acknowledged: "*If my father wants me to drop dead he doesn't need to do anything else.  He has made how he feels about me perfectly clear.*"  And in a June 11, 2014 email to Tyler Korff, despite already having hundreds of millions of dollars as a result of Sumner, she complained:  "*My father deliver[ed] a message to me [t]hru his attorney that he understands my children are struggling and he doesn't give a shit and he doesn't care that everyone in Sidney [sic] and Manuela's family including their parents and children are treated better and have an easier lifestyle [t]han my children[.]*"

72.     In fact, during this time frame, Shari Redstone was already contemplating legal action against Herzer as part of her strategy.  On September 15,

22

FIRST AMENDED COMPLAINT

2014, Shari Redstone wrote in an email to Tyler Korff and her other children, Kimberlee Ostheimer and Brandon Korff:

> "I have come to the conclusion that there is absolutely nothing that I can do. . . . ***We would not win a lawsuit to get rid of S[ydney Holland] and M[anuela Herzer]. And that would not necessarily be the right thing to do***. . . . [U]ltimately your grandfather made the decisions that he made. I just called . . . and ***all he kept saying was leave Sydney and Manuella [sic] alone. he said it 100 times***" (emphasis added).

73.     Despite Sumner's clear intentions and desires, Shari Redstone refused to agree to the lucrative deal and the release provisions.  In a September 30, 2014 email to Tyler Korff, Shari Redstone wrote: "***[W]hy would I ever give [Sumner] his dying wish of peace when he never gave me any peace during my whole life*** . . .***Going after these [women] will give me peace[.]***"

74.     After Shari Redstone's rejection of his offer, Sumner continued to clearly communicate his desire that she stay away from his affairs.  In an October 21, 2014 email to her daughter Kimberlee, Shari Redstone wrote:

> "***I can't believe you keep calling him when he could not make it any clearer that all of us could drop dead and it would be the happiest day of his life the end. Have a nice day. . . . It is all about protecting Smr and making sure he and Manuella [sic] and Sydney get everything and I get destroyed enough.***"

75.     That same day in an e-mail sent to her three children Tyler, Kimberlee and Brandon, Shari again acknowledged that Sumner did not want Shari Redstone or her family members to interfere in his life:

> "***It could be [sic] not be more clear that the only people in the entire world who your grandfather doesn't care about, and [in] fact is willing to hurt, damage, and destroy are the four of us . . . . He could not go to any stronger lengths to insure [sic] that we are all left with nothing and that his little sluts get it all with no interference by us. . . . He is not a puppet..***"

76.     At this point in time, it was clear to Shari Redstone that that she could

FIRST AMENDED COMPLAINT

Case 2:17-cv-07545-PSG-KS Document 62-3 Filed 04/28/18 Page 26 of 66 Page ID
Case 2:17-cv-07545-PSG-KS Document 51-2 Filed 03/27/18 Page 29 of 65 Page ID#:598
#:1716

not obtain her ultimate goals legally or through Sumner voluntarily. This is why Shari Redstone and Tyler Korff began their plot to infiltrate Sumner's life.

77. Initially, as Tyler Korff wrote in a March 24, 2015 email to Shari, their goal was to collect personal information about Manuela Herzer and others – whether true or not and then have Shari Redstone use her "pr machine" to crush Herzer. One of the first instances of this initial strategy being put into effect occurred in mid-September 2014, when Sumner underwent medical testing at the hospital. Because Shari Redstone's prior one-on-one visit with Sumner at the hospital had already caused him great anxiety, Sumner instructed Adam Streisand, his estate planning lawyer from the law firm Loeb & Loeb, to inform Shari Redstone and her lawyer that Sumner did not want her to be present when he underwent the planned medical testing.

78. Streisand diplomatically explained the sensitive request in a politely-worded email dated September 16, 2014 (set forth below) stating, "In any event, Sumner has made it abundantly clear to us that he does not want his daughter anywhere in the vicinity when Sumner undergoes medical testing tomorrow."

Ms. Burnett,

As you know we represent Sumner Redstone. I am advised that over the objection of Mr. Redstone's nurses, your client insisted on seeing your father alone, and that the visit caused Mr. Redstone great agitation and some concern by the nurses about the effect on Mr. Redstone's condition. In any event, Mr. Redstone has made it abundantly clear to us that he does not want his daughter anywhere in the vicinity when Mr. Redstone undergoes medical testing tomorrow. Please communicate to your client that her father has asked that we convey this message to her and that we are to take whatever actions are necessary to prevent her from disobeying his instruction. Of course, we trust that will not be necessary and she will comply with her father's wishes.

I would appreciate it if you would confirm that you have communicated the message to your client and that she will respect her father's wishes.

Thank you,

Adam Streisand

79. Tyler Korff took Streisand's email – which contained no indication of involvement by Herzer whatsoever – and, as he would do time and time again in the months to come, distorted it into outrageous falsehoods designed to malign Herzer.

80. In a September 17, 2014 email, Tyler Korff wrote to David Andelman, Sumner's long-time personal attorney, accusing Herzer of seeking to ban Sumner's family from seeing him at any time: "We've been banned from seeing him, and have been threatened that they'd have us arrested if we tried . . . ." But, as Tyler knew,

24

FIRST AMENDED COMPLAINT

Sumner himself had requested that Shari Redstone not be present during his medical procedure and no one – much less Herzer – had threatened anyone with arrest.

81. Tyler Korff wrote in a September 18, 2014 email to George Abrams, a trustee of Sumner's NAI Trust for decades and a Viacom director, and again made a malicious falsehood designed to turn Sumner's confidantes against Herzer – namely, that "[Sydney] and Manuela dictate to SMR [Sumner] what he MUST say to the attorneys and verbally abuse SMR when he deviates from the script."

82. Likewise, in an September 16, 2014 email, Tyler Korff told David Andelman that same falsehood, writing that "Manuela and Sydney dictate to SMR everything he MUST say in conversation with Leah [Bishop, co-chair of Loeb & Loeb's estate planning practice and Streisand's colleague] and verbally abuse him if he deviates. I'm told they verbally abuse him threaten him and nag him on a daily basis."

83. Apart from the falsehoods told by Tyler Korff, these e-mails were concerning because his "I'm told" language indicates that he was speaking and collaborating with those close to Sumner. In fact, Shari Redstone and Tyler Korff were secretly conspiring with Sumner's nurses and household employees, who each had been bribed to cooperate and do everything necessary to help them gain control of Sumner's personal life.

**F. Shari Redstone and Tyler Korff Bribe Nurses in Exchange for Loyalty and Information.**

84. To Shari Redstone and Tyler Korff, Sumner's household staff were a key aspect of the overall strategy. They were the most susceptible to bribes and, with such financial control, could then be turned against Manuela Herzer – as, given her insistence for top notch healthcare for the then 92-year-old Sumner, she was properly demanding on them.

85. The first nurse that Shari Redstone and Tyler Korff bribed was Giovanni Paz. After initially making outreach to Paz, Shari Redstone, Tyler Korff and her other

25

FIRST AMENDED COMPLAINT

Case 2:17-cv-07546-RSC-KS Document 162-3 Filed 04/28/18 Page 28 of 66 Page ID
#:1718
Case 2:17-cv-07546-SGK-KS Document 31-2 Filed 03/27/18 Page 29 of 65 Page ID#:400

son, Brandon Korff, began seeking personal information about Sumner and those around him. Paz responded that he was concerned that Sumner would learn that he was violating the confidentiality agreement. Paz, like all members of Sumner's nursing and household staff, were required to sign a confidential agreement as a condition of his employment stating:

> I agree not to disclose, reveal, copy, reproduce, publish, confirm, permit access to, display, release, or otherwise communicate with or to any person, make available or allow to be copied or produced at any time in any manner whatsoever (including, without limitation, after the completion or termination of my discussions or activities relating to the Household), any Confidential Information . . . .

86.     The agreements also made clear that they were made for the benefit of not only Sumner and the companies he owned, but also for Manuela Herzer as it covered "all family members and relatives of the Employer, any person for whom the Household serves as a primary residence, prior or future residents, visitors and houseguests to the Household and other persons previously or currently employed to provide household services therein."

87.     A few days after they had started communicating, Shari Redstone told Tyler Korff in an email dated September 10, 2014 that "Giovanni [Paz] is in a panic. He was interviewed and questioned by Leah Bishop. . . . Betsy told him to get a lawyer."

88.     To calm Paz and induce him to ignore his confidentiality obligations, Shari Redstone offered secret financial inducements. On or about September 10, 2014, during a phone call with Paz and Elizabeth Burnett, her personal attorney, Shari Redstone assured Paz that he would be taken care of in case his deception was uncovered. Shari Redstone also involved Tyler Korff in the discussions with Paz, in part to create distance from the illicit acts she was directing Paz to commit. During their September 10, 2014 phone call with Paz, Shari Redstone and Burnett also promised that if Paz was fired, they would – without Sumner's knowledge – provide

1   him with financial assistance – *i.e.*, a bribe – in an amount equal to one month's salary

2   for Paz, or just under $9,000.

3        89.     On September 23, 2014, Paz responded to Shari Redstone's offer and

4   wrote an email to her stating, "***[I] want to thank you for all the support you have***

5   ***gave me in this difficult times.  I'm taking in[to] consideration your offer to help***

6   ***me.  At this time is very hard for me to maintain my finances there[]for[e] I'm***

7   ***embarrassed to ask for help.  Thank you, Mrs. Shari.***"

8        90.     In a September 30, 2014 email, Shari Redstone responded to Paz stating

9   that "***I will get back to you next week regarding what we discussed.  In the meantime,***

10   ***should anything come up that you want to share please contact Tyler directly.***"

11   Tyler Korff also told Paz in an email dated the same day that "***[i]f you need anything***

12   ***that isn't addressed by the end of next week, just get back to me.***"

13        91.     Paz thereafter began providing confidential information about Sumner's

14   September 2014 hospital stay.  But when Sumner discovered that Paz had shared with

15   others this private information, he had Paz immediately terminated for breaching the

16   confidentiality agreement

17        92.     After Paz was fired, Shari Redstone followed through on her promise

18   and made the payment to Paz.  In exchange, Paz confirmed he would continue

19   providing them with information he had learned while working for Sumner as well as

20   information he obtained from his former colleagues who continued to work as

21   Sumner's nurses.  At the request of Shari Redstone and Tyler Korff, Paz then helped

22   connect them with other nurses and household staff who could  provide them with

23   information in exchange for promises of payment or other benefits – a critical

24   component of the overall plan.

25        93.     Shari Redstone and Tyler Korff took measures to make sure their actions

26   were kept secret.  Among other things, in the below September 24, 2014 e-mail, Tyler

27   Korff advised Shari Redstone to write a check to Paz but also cautioned her to "***be***

28   ***careful about giving them any of them money at this time as it could be interpreted***

<div align="center">27</div>

*as a bribe or tortious interference.  Maybe meet him for a few minutes in person
when you're in LA and get a feel for the situation?*"

| From: | Tyler Korff <tkorff@gmail.com> |
| To: | Shari Redstone <ser3737@gmail.com> |
| Sent: | 9/24/2014 1:46:41 AM |
| Subject: | Re: Thank you Ma'am |

How much is one months' salary? He might be being paid one month and he just wants/needs more, or maybe they fired him for cause and aren't paying him. I have no idea. I'd be careful about giving any of them money at this time as it could be interpreted as a bribe or tortious interference. Maybe meet him for a few minutes in person while you're in LA and get a feel for the situation?

On Tue, Sep 23, 2014 at 9:42 PM, Shari Redstone <ser3737@gmail.com> wrote:
What do you suggest I do, I thought he was being paid one months salary so I am a little confused.

94.    In addition to paying bribes to control the staff, Shari Redstone's plan
involved requiring the staff members to keep secret daily journals and to share them
with her and Tyler Korff.  And both knew that this conduct was illegal.  In a
September 24, 2014 email, Tyler Korff told Shari Redstone that "*giving him money,
along with your email instructing the staff to keep a daily journal (even if that's not
what you meant) could be seen as evidence of your interference*" (emphasis added).
But that is precisely what Shari Redstone had meant.  As Tyler Korff acknowledged
in the same e-mail chain, "*But I thought you told Joseph to have them all keep daily
journals.  I was just saying that if you paid them, that could indicate in hindsight
you were interfering.*"

95.    Further highlighting their awareness of illegality, Shari Redstone and
Tyler Korff also knew that, as family members who did not live in the household,
they had no right to do what they were doing.  In a October 15, 2014 email**,** Tyler
Korff told Paz in response to his request for a reference that "no one in the family can
write you a recommendation because we weren't your employer and weren't at the
house on a daily/regular basis."

96.    To ensure ongoing loyalty, Shari Redstone and Tyler Korff thereafter
made continual promises of financial assistance – *i.e.*, bribes – to other nurses in
exchange for their loyalty and assistance in carrying out their scheme.  Tyler Korff
also began to purchase expensive gifts for the nurses and even their family members.

97.    The amounts paid and promised were significant.  In the below July 18,

28

2015 e-mail, after he had been proving private information about Sumner and Herzer for several months, nurse Joseph Octaviano wrote to Tyler Korff in response to entreaties from Shari Redstone and Tyler Korff for assistance opening a laundromat and purchasing a house:

| | |
|---|---|
| **From:** | Weena Octaviano <tsalapito@gmail.com> |
| **To:** | Tyler Korff <tkorff@gmail.com> |
| **Sent:** | 7/18/2015 4:43:49 PM |
| **Subject:** | Thank you very much. |

I have been thinking, Ms. Shari and yourself have been asking me, if I need anything just to let you know. At first I thought, let me prove to them that I am able to deliver what I have asked to do then maybe it would be okay. My wife and I have discussed, after Mr. Redstone, what should I do? I don't think I would like to take care of another individual. I'm too old.

I asked my wife to do some research, she wanted to open a restaurant, that is why tsalap was born. Could have been a good name for our restaurant. (Tsalap means delicious) But then as she did more research, she kinda hesitant to open because of too much work involve. Too much liability.

Then as she drove around one day, she saw some washateria....a laundromat. Bingo! She said, this is it! Less work, money will just keep on pouring. A lot of quarters, lol! But less work. We would like to open a state of the art washateria in Van Nuys area. There are a lot of them in the area, but their machines are all old and dinghy. Mine will be all stainless steel and will require less time of washing. Who wants to spend time washing their clothes. My machines will do the work in just a few minutes.

Therefore, if I may, I would like to ask you to help me make this dream come true. Also we would like to purchase a house. I would like to thank you and your Mom for the trust in me. I hope this is not too much to ask.

Joseph

98.    Shari Redstone and Tyler Korff also promised that once they had taken control of Sumner's household and removed Manuela Herzer, payments would be made more overtly, overtime limits would be removed, and any fired nurses would be re-hired or receive other benefits.

99.    Payments made after October 2015 – when Shari Redstone and Tyler Korff took over Sumner's household – confirm the fact of these promises. In August 2016, the two caused the execution of a written agreement with Paz providing him with an additional $35,000 payment in exchange for a release of liability including Sumner's "children, grandchildren and heirs," and also for a promise to "not voluntarily aid or encourage any third-person" – namely Herzer and Holland – "in connection with the pursuit of any such claims" against those he had released. Thus, after having already been bribed once, Paz was again paid substantial amounts in exchange for promising to not reveal his involvement in Shari Redstone and Tyler Korff's scheme and for providing assistance in connection with the elder abuse lawsuit Shari Redstone's lawyer, Robert Klieger, would later file against Herzer.

100.   Likewise, Shari Redstone and Tyler Korff followed through on their

29

promises to pay substantial amounts to the nurses. For example, Jeremy Jagiello, one of the nurses involved in the scheme, started earning between $200,000 and $250,000 per year – extraordinary amounts for him and substantially more than he had ever been paid by Sumner prior to Herzer's eviction or by any of his other employers.

## G.    Shari Redstone and Tyler Korff Direct the Illegal Collection of Private Information About Manuela Herzer and Her Family.

101.    With Sumner's nurses and household staff now serving as secret spies, Shari Redstone and Tyler Korff continued gathering information, sharing it with their attorneys and PR consultants and using it to create lies that could be used against Herzer.

102.    For example, at Shari Redstone's direction, nurse Joseph Octaviano began sending Tyler Korff secret emails containing an hour-by-hour account of everything that happened inside Sumner's home, including information about Herzer, her children and their private conversations and activities. In order to avoid detection of his communications with Tyler Korff that violated his confidentiality agreement with Sumner, Octaviano created a new email account using his wife's name (Weena Octaviano) that he used only for the purposes of communicating with Shari Redstone and Tyler Korff. Octaviano promised Shari Redstone that he would "be very transparent" in a September 11, 2014 email, and subsequently wrote another email to her stating that "I am at your side and . . . will be willing to testify against . . . Manuela and Sydney." At the time, Octaviano had been working in Sumner's residence for just a few months and had only just met Shari for the first time a few days earlier.

103.    Tyler Korff also began text messaging with nurse Jeremy Jagiello on a daily basis. Like other members of the nursing and household staff, Jagiello resented Herzer due to the high quality of service she demanded of those who cared for Sumner and because she would not hesitate to replace members of the staff who did not meet professional standards. Tyler Korff inundated his cadre of staff-turned-spies on a daily basis with slanderous comments about Herzer through thousands of text

messages and emails – a propaganda campaign designed to further turn them away from Herzer.

104.   Shari Redstone, her personal attorney Elizabeth "Betsy" Burnett and Tyler Korff also set up a communication system designed to hide their tracks.   To distance herself from the operation of the scheme, in a April 2, 2015 email to Tyler Korff, Shari Redstone asked Tyler to serve as her "representative" and forward the information he received to Burnett, who would then distill the information relevant to Shari Redstone's purposes, namely, information about Herzer and Holland, before sharing it with her.

105.   In a September 18, 2014 email, Burnett wrote to Tyler Korff, "***Please keep forwarding these [emails from Octaviano] to me as well, and I will file them in my 'Holland' Outlook sub-file.***"   Tyler Korff confirmed in an April 2, 2015 email to Shari Redstone that "***[s]taff have risked their jobs to discuss these matters with me – and I share with Betsy not just what Joseph emails me but generally all the updates I receive from all household staff and what I witness first-hand.***"

106.   Tyler Korff also made sure to take actions that would prevent Sumner or Herzer from learning about his constant communications with Sumner's staff.   For example, when Tyler came to Los Angeles to attend Sumner's birthday party, he told nurse Jagiello in a May 27, 2015 text message, "***I have to pretend I don't know you . . . in front of the women just in case.***"

107.   In an April 10, 2015 email, Octaviano informed Tyler Korff that he suspected security cameras had been installed to "***catch the person that gives you guys informations [sic].   CAREFUL is the name of the game this time***."   Tyler Korff responded two days later, "***Yes, careful is key! I don't tell anybody anything about you or Jeremy.   Thanks for the update and the warning***."

108.   In an April 14, 2015 email, after learning that Burnett was contemplating telling Sumner's attorney she had received confidential information, Tyler Korff beseeched her to avoid saying anything that Sumner's attorney would "***indubitably***

31

*interpret . . . as information I obtained 'covertly' and then related to you and my mother.*"  Burnett helped cover up the conspiracy and assured Tyler Korff that she had "dispel[led] any suspicions that the info came from inside the house."

109.   With the secret conspiracy protected from detection, Tyler Korff directed the nurses and other staff members to  continue to monitor the whereabouts of Herzer and her children, and to report that information back to him.  Tyler also directed the nurses to eavesdrop and even use assorted electronic devices to secretly record private conversations Herzer had with Sumner, attorneys and others, and then email, text message and use other means to send those recordings to Tyler in Massachusetts.

110.   Tyler Korff also asked the nurses to procure Herzer's confidential financial information, including information about her bank accounts and records of wire transfers made to Herzer, Sumner and others.  For example, in an April 30, 2015 text message that he sent to Tyler, Jagiello wrote that "*a new [C]ity [N]ational [Bank] document just came through . . . new one is 50k[,] will try and snap a pic for you*." In a May 1, 2015 text message from Tyler Korff to nurse Jeremy Jagiello, Tyler asked, "*Any mention of foreign bank account[s] that Syd[ney] or Manuela might own?*" In another text message sent on June 5, 2015, Tyler Korff asked "*You think these women have offshore bank accounts*?" Jagiello responded, "*will try and find out [i]f possible.*"  Jagiello also secretly took photographs of documents confirming wire transfers to Herzer, Sumner and others and then sent those photographs to Shari Redstone and Tyler Korff.

111.   Herzer is informed and believes that her personal computer was also accessed and the login information for at least one of her emails accounts was stolen by members of Sumner's household staff without Herzer or Sumner's authorization. The staff members accessed and stole Herzer's documents and emails stored on the computer, and even sent emails from Herzer's email account.

FIRST AMENDED COMPLAINT

**H.**      **Shari Redstone and Tyler Korff Illegally Use Manuela Herzer's Private Information To Spread Lies and Evict Herzer.**

112. Having gathered an enormous amount of personal and private information, Shari Redstone and Tyler Korff began using the information to create a false narrative designed to sabotage Herzer. By creating this false narrative, they hoped to convince Sumner's advisors and professionals to assist in their scheme to remove Herzer from the household.

<div style="border:1px solid">

**Sumner M. Redstone**
31 Beverly Park Terrace
Beverly Hills, CA 90210

January 8, 2015

Ms. Shari Redstone

Re:    <u>Personal Request</u>

Dear Shari:

     Over the last few months, our respective lawyers and investment bankers unsuccessfully attempted to negotiate a spin-off to segregate our interests in National Amusements. As a condition of that spin-off, I asked my lawyers to include releases of Sydney Holland and Manuela Herzer, to be signed by you, Phyllis, and your children. I requested these releases because I want to be able to spend the rest of my life, however long that is, knowing that Sydney and Manuela will not be faced with litigation from my family at a time when they are grieving my passing.

     I believe that you rejected the spin-off for financial reasons and not because of the requested releases. With this in mind, I am asking you to sign a release agreement and I will also ask other family members, including Phyllis and your children, to sign that agreement. This is very important to me. I want to know now, while I am alive and able to hear your response, whether you will agree to sign such a release agreement.

     I have left detailed funeral and burial instructions, with the clear direction that Sydney and Manuela will be in charge of all arrangements. I want to enjoy the rest of my time on earth with peace of mind. If you decline to sign a release agreement, I will be compelled, albeit with deep regret, to direct Sydney and Manuela not to allow you, Phyllis, or your children to attend the funeral or in any way be involved in the burial arrangements.

     Please let me know promptly whether I may direct my lawyers to prepare that release. I hope you will respect my wishes.

Your father,

Sumner M. Redstone

</div>

33

113.   But Sumner continued to make clear his intentions.  On January 8, 2015, Sumner sent a letter to Shari begging her to acquiesce to his requests

114.   Sumner's letter made Shari Redstone furious.  In a January 9, 2015 email, she wrote to Tyler Korff and her other children stating that she would refuse to "*sign releases against the whores who will be grieving his loss*" (internal quotations omitted) and that "*[t]here is absolutely nothing more to be said….EVER!!!!*"  Shari noted that "*he thinks the threat of not being allowed to go to his funeral will motivate me*."

115.   Given that Sumner's letter undermined the false narrative they were seeking to create with third parties, Shari Redstone and Tyler Korff knew they had to dismiss the letter as having come from Herzer and Holland and not Sumner.  Shari instructed her lawyer Burnett to send a letter to Leah Bishop dated January 9, 2015 stating that "[t]he January 8th letter makes it very clear that Sydney and Manuela having failed to obtain releases as part of the spinoff transaction now plan to ban Shari and her family from Sumner's funeral and burial."

116.   But Leah Bishop, Sumner's estate planning attorney at Loeb & Loeb, immediately dispelled the notion that the letter had not been prepared at Sumner's direct request.  In an email sent to Burnett the same day**,** Bishop responded, "I am compelled to correct the statement in your letter.  Sydney and Manuela are not banning anyone from Sumner's funeral. *Sumner has given this direction.*"

117.   In her January 12, 2015 email response to another letter on this issue sent be Tyler Korff, Bishop added, "As I explained to Betsy Burnett, this letter did not come from Sydney and Manuela.  *I prepared it at Sumner's direction I met with him and went over it multiple times to confirm it was exactly what he wanted and he signed it*.  *My only goal here is to carry out Sumner's wishes*."

118.   Responding to Bishop in an email sent the same day, Tyler Korff claimed that, despite having not been present or spoken with Sumner recently, he had "incontrovertible," "overwhelming evidence" that Sumner had been forced to send

the letter against his will.  What Tyler Korff was referring to was the secret spies he had in the household who were feeding him personal information which he could then distort for his own purposes.  In fact, there was no evidence whatsoever that Sumner had been forced to send the letter against his will.

119.   In the below January 12, 2015 email to Tyler Korff, Bishop yet again rejected the false narrative.  She explained that she had met with Sumner in person to confirm that the letter accurately reflected his wishes.  She wrote, "*I drafted the letter on his instructions before the new year holiday.  I faxed it to him to consider but did not send it until I had the opportunity to meet with him personally after the holiday and confirm his wishes.*"

| From: | Leah M. Bishop <lbishop@loeb.com> |
|---|---|
| To: | Tyler Korff <tkorff@gmail.com> |
| CC: | David R. Andelman (DAndelman@louriecutler.com)" <DAndelman@louriecutler.com> |
| Sent: | 1/12/2015 8:47:00 PM |
| Subject: | RE: Sumner M. Redstone |

I think we will have to agree to disagree.  Just so you know, I drafted the letter on his instructions before the new year holiday.  I faxed it to him to consider, but did not send it until I had the opportunity to meet with him personally after the holiday and confirm his wishes.
David will be out to visit at the end of the month and we will discuss this again with Sumner.  I encourage you to visit him so that you can speak with him personally about this.

From: Tyler Korff [mailto:tkorff@gmail.com]
Sent: Monday, January 12, 2015 12:35 PM
To: Leah M. Bishop
Cc: David R. Andelman (DAndelman@louriecutler.com)
Subject: Re: Sumner M. Redstone

Thank you, Leah. I do know Sydney and Manuela sometimes pick and choose which sentences to read to him, so upon your next call or visit with my grandfather, I would appreciate if you would make sure he knows how much we all love him. If you tell me you caught him in a mood where he was susceptible to authorizing the letter you sent us, then I believe you, and I hope you believe me when I tell you he expressed contrary wishes relatively recently. The overwhelming evidence that this matter originated with Sydney and Manuela is, quite frankly, incontrovertible. Best regards, Tyler

On Mon, Jan 12, 2015 at 2:48 PM, Leah M. Bishop <lbishop@loeb.com> wrote:
I spoke to him after he reviewed it, so I know he received it.

120.   On January 13, 2015, Sumner directed Bishop to prepare a letter appealing directly to his grandchildren Tyler, Brandon and Kimberlee and setting the record straight about his relationship with Herzer and Holland:

> *There has been no alienation of any kind on the part of Sydney, Manuela, or anyone else, and please do not insult me by suggesting otherwise.* From what I've heard my daughter Shari has been to Los Angeles several times and has not bothered to call or visit me.
>
> *I love Manuela and Sydney very much. I consider them and their children my family.* My sincere wish is that there is no litigation -

35

between anyone. I ask you to honor this wish.  (emphasis added).

121.   Bishop again confirmed that Sumner himself had directed her to write the letter.  Given their lack of success getting Bishop to buy into the false narrative they were peddling, however, Tyler Korff wrote to his sister Kimberlee and suggested they avoid engaging further with Bishop to avoid doing further damage to the concocted record they had been carefully constructing.  In the email dated January 14, 2015, Tyler Korff cautioned that "*[o]nce you respond to the allegations, if any subsequent versions of events (e.g. in a deposition three years from now) differs from the account [their brother Brandon] sends Leah now, even slightly, he'd risk being impeached*."

122.   Having failed to convince Sumner's attorneys and advisors, Shari Redstone and Tyler Korff continued to collect private information that they could use to sabotage his relationships.  In a May 22, 2015 text message, Jagiello reported to Tyler Korff, "Call just came in[] to house now from [V]iacom[.]  We are still banished to kitchen[.]  Women picked it up . . . Hear them talking to Smr [Sumner] about birthday[.] Can only hear bits and pieces . . . . Now Leah [B]ishop's name cropped up about trust[.] Can't hear what though[.] Sounds like they are trying to get Smr to transfer money for something . . . couldn't make out exactly what though."  At Tyler Korff's direction, Jagiello even recorded privileged and confidential meetings where Sumner and Herzer met with Sumner's lawyer Leah Bishop and Dr. James Spar to discuss changes to his estate plan.  This information was then sent to Tyler Korff, Shari Redstone and her lawyers.

123.   But, even in these secretly eavesdropped conversations, Sumner continued to make clear that he intended to resist Shari Redstone's corporate goals. For example, in June 2015, Octaviano told Tyler Korff that Sumner had asked him to dictate a message.  Octaviano explained that Sumner told him, "I will give my stocks from CBS to Sydney [Holland]. That way Les [Moonves, CEO and President of CBS]

and Shari cannot sell CBS."  As explained above, Sumner had long been concerned that Shari Redstone would use her ownership against his wishes.

124.   Knowing that the nurses would support any story they concocted, Shari Redstone and Tyler Korff thereafter amplified the severity of their lies about Herzer. Hoping to undermine Sumner's efforts to enforce his wishes. Shari Redstone and Tyler Korff began to suggest that Sumner's attorneys had actually been hired and retained by Herzer and not Sumner, that the attorneys were allowing the women to send letters from Sumner without his knowledge and that the women were coaching and threatening Sumner regarding what to say to his attorneys when they met in private.  They also began to suggest that Herzer had actively been preventing Sumner's family and friends from communicating with him.

125.   One the most significant lies concocted by Shari Redstone and Tyler Korff was that Sumner was being abused.  Desperate to remove Herzer, they secretly caused the nurses to file a false report with the Adult Protective Services ("APS") agency in Los Angeles.  That report claimed that Herzer physically and verbally abused Sumner, isolated him from his family and forced him to sign documents against his will.

126.   Following a comprehensive investigation by APS into the allegations, which included an in-person interview where Sumner told the investigator that he was not being abused, APS closed the investigation without any further action.

127.   In a February 10, 2015 e-mail exchange between Tyler Korff and Shari Redstone, he explained that "*[Sumner] told [the APS investigator] that he's not being abused, [and] the case will likely be closed. That seems to confirm what we all heard as well.*"  Shari Redstone responded, "*This is just the first inning… Of everything!!!*"

128.   In late August 2015, however, Sumner suffered an emotional event in his life.  Holland admitted to Sumner that she had been dating another man.  The affair was devastating as Holland had been using Sumner's jet and money to carry out her

Case 2:17-cv-07545-PSG-KS Document 162-3 Filed 04/28/18 Page 40 of 66 Page ID
Case 2:17-cv-07545-PSG-KS Document 51-2 Filed 03/27/18 Page 39 of 65 Page ID #:412
#:1730

1   secret life with her boyfriend in Arizona.  Herzer was unaware of any of this and did

2   not condone any of it.  Holland openly admitted to Sumner that although she had been

3   living in his home, she had also been seeing another man.  Heartbroken by her

4   infidelity and betrayal, Sumner demanded that she leave his home.  This event

5   obviously had a profound impact on Sumner's emotional, mental and physical health.

6       129.   This event became a prime opportunity for Shari Redstone and Tyler

7   Korff to capitalize on and to manipulate an emotional, physically diminished and

8   elderly Sumner past his tipping point and move to evict Manuela Herzer.  In a

9   September 2, 2015 email, Tyler Korff wrote to Shari Redstone and his siblings to

10  inform them that Holland had left the house and that it was time to "devise a plan"

11  focused on ousting Herzer.  Tyler Korff first coordinated with the nurses to make

12  another report to APS based on the false narrative they had been developing.  As Tyler

13  Korff wrote:

14      *APS is expected to arrive in the afternoon. . . . We shall see what*
15      *happens, and then we can devise a plan. At the very least, that plan*
16      *might include calls and visits (coordinated directly with SMR or*
        *through Gloria). Depending on APS, and Manuela's course of*
17      *conduct (and Keryn's), we have to intervene.*

18      130.   Notwithstanding Tyler's efforts, after returning to Sumner's house to

19  interview staff, APS representatives again determined that there was no evidence

20  warranting the opening of an investigation into the claims of elder abuse.

21      131.   Tyler Korff also attempted to manipulate Sumner's estate plan.  On

22  September 2, 2015, Sumner's estate planning attorneys Leah Bishop and David

23  Andelman arrived at Sumner's home to make changes to Sumner's estate plan to

24  remove the bequests Sumner had previously made to Holland and transfer them to

25  Herzer.  Bishop and Andelman met in person with Sumner to confirm his wishes,

26  outside of Herzer's presence.  Shari Redstone and Tyler Korff carefully followed

27  these development through the household staff and were also directly communicating

28  with Bishop and Andelman in an attempt to influence them.  But although Sumner

was emotionally distraught by Holland's betrayal, Bishop and Andelman both felt in their professional opinions that Sumner had testamentary capacity, and even had a respected psychiatrist perform a battery of cognitive tests to confirm Sumner's intentions.

132. Undeterred, Tyler Korff contemporaneously directed the nurses to focus their attention on now turning Sumner against Herzer. As Sumner had just been betrayed by his girlfriend, Sumner was emotionally vulnerable and thus naturally sensitive to reports of betrayal by those he had always trusted. Shari Redstone and Tyler Korff saw this as an opportunity to take advantage of Sumner's mental condition and then take over his household.

133. Beginning on September 2, 2015, Tyler Korff and Jagiello began communicating with even more frequency by text and through numerous phone calls during which Tyler instructed Jagiello how best to influence Sumner with the false narrative about Herzer that he and Shari Redstone had constructed.

134. For example, on September 18, 2015, nurse Jagiello exchanged the following text messages with Tyler suggesting that Tyler and Jagiello had planned an "operation" to feed misinformation (what Jagiello falsely refers to as "the truth") to Sumner that would cause him to remove others from his life:

> Jagiello:   Good morning. Thanks for talking last night. ***Seal team may commence operation freedom today!*** FYI! I will keep you posted…
> Tyler:      Ha it kinda does take seal precision! Thanks for the update…
> Jagiello:   Let's hope this goes well. Smr [Sumner] asked me same question this am. Once he knows the truth he is going to be livid!

135. At another meeting with his attorneys Bishop and Andelman held on October 2, 2015, Sumner asked Herzer to read a handwritten letter that Holland had written on stationary. Jagiello, who was present to help interpret Sumner's difficult-to-understand speech, noticed that Sumner was extremely emotional about the content

<div align="center">39</div>

<div align="center">FIRST AMENDED COMPLAINT</div>

1    of the letter and wanted it to be read to him repeatedly. Jagiello saw an opportunity

2    to manipulate Sumner to turn him against Herzer and called Tyler Korff to get

3    approval for his plan.

4        136.  On the next day, October 3, 2015, Jagiello sent a text message to Isi

5    Tuanaki, Sumner's driver, asking for the password to access the computer at the

6    residence. Tuanaki, the only staff member authorized by Sumner and Herzer to use

7    the computer, provided the password to Jagiello. Jagiello then used the password to

8    access the computer and then access Herzer's AOL email account.

9        137.  When Sumner began asking for Holland's letter to be read to him again,

10   Jagiello used his access to Herzer's email account to write a fake letter purporting to

11   be sent by Holland. Jagiello sent the email to Herzer's email address, printed the

12   email, and then read the fake letter to Sumner. The fake letter that Jagiello wrote gave

13   the false impression Holland was recanting her admission of infidelity, and Sumner

14   became extremely furious when Jagiello read the letter to him.

15       138.  Hearing the commotion, Herzer walked into the room and joined Jagiello

16   and another nurse named Ben Ferrer in their attempts to comfort Sumner. Herzer told

17   Sumner that there were pictures on the internet of Holland that disputed the account

18   given in the letter that Herzer assumed had come from Sydney. Herzer did not know

19   at the time that Jagiello himself had forged the letter he had read, and both Herzer and

20   Sumner were led to wrongly believe that Holland had written the letter, not Jagiello.

21       139.  The purpose behind Jagiello's forging of the letter became clear a few

22   days later when he misrepresented to Sumner that Herzer had made him forge the

23   letter – causing an emotionally distraught Sumner to believe that Herzer had been

24   withholding important Holland-related information from him.  Jagiello also began

25   telling Sumner a litany of other lies, including that Herzer had "stolen millions" of

26   dollars from him, that Herzer was going to fire Jagiello, one of the only nurses who

27   could interpret Sumner's speech and facilitate his conversations with others, and that

28   Herzer had installed cameras without Sumner's permission. None of those statements

FIRST AMENDED COMPLAINT

Case 2:17-cv-07545-SGK-S Document 162-3 Filed 04/28/18 Page 43 of 66 Page ID
Case 2:17-cv-07545-SGK-S Document 31-2 Filed 03/27/18 Page 42 of 65 Page ID #:415
#:1733

1   were true.

2       140.  As these falsehoods were being spread, Tyler Korff remained closely in

3 touch with Jagiello to coordinate and plan their attack on Herzer.  Days later, the

4 scheme to oust Herzer by feeding Sumner false and misleading information would

5 finally succeed.

6       141.  On October 12, 2015, at the direction of Shari Redstone and Tyler Korff,

7 Jagiello presented an already-distraught 92 year-old Sumner with a series of false and

8 misleading statements presenting Herzer in a negative light with ridiculous and

9 scurrilous accusations.  Jagiello again falsely represented to Sumner that Herzer had

10 "stolen millions" from Sumner.

11       142.  The following document is an excerpt from the nurse's log dated October

12 12, 2015 showing the type of false and misleading information that the household taff

13 shared with Sumner at the direction of Shari Redstone and Tyler Korff in furtherance

14 of their unlawful scheme.

143.    The excerpt from the nurses log dated October 12, 2015 states: "***Jeremy [Jagiello] now briefing SMR [Sumner] on the day's events. 'Sumner, Manuela was stealing millions of dollars from you… She kept all of us away from telling you the truth.***" Octaviano and Tuanaki made similar false representations to Sumner on or about the same day – all as a result of the bribes and direction of Defendants.

144.    With a diminished and distraught Sumner having supposedly expressed some desire to have Herzer removed (which has never been confirmed), Shari Redstone and Tyler Korff immediately hired security to keep Herzer off the property and created an atmosphere of commotion and chaos designed to prevent any reasoned determination of Sumner's wishes.  The efforts of Shari Redstone and Tyler Korff succeeded.  Herzer was illegally removed from the residence under threat of force, and never allowed to see or speak to Sumner again.

145.    Tyler Korff's contemporaneous texts are revealing as to the underhanded and illegal tactics employed on October 12, 2015.  That same day, Tyler – who intentionally was not at the house that day but was secretly already camped nearby – sent a text message to his brother Brandon stating "Manuela evicted…her family no longer welcome either." When Brandon asked Tyler "I wonder what the info he [Sumner] got was," Tyler responded, "long story…***this is what we've been working towards*** . . . Let's talk later off text" (emphasis added).

146.    On that same day, Tyler also sent text messages to Jagiello instructing him to "make a note of all the cameras and recording devices, we can probably remove them now[.] Or at least the ones that weren't for security purposes." Tyler then added about an hour later, "Just landed. Maybe we can all meet at the house tomorrow! I need to discuss new proxy and poa [power of attorney] with David…***maybe we can get you all some job security***" (emphasis added).  Indeed, the nurses and staff members who had conspired with Shari and Tyler were rewarded with increased salaries, while the nurses and staff who had not broken their confidentiality agreements by serving as spies were swiftly fired at Shari and Tyler's direction.

42

147.    Shari Redstone and Tyler Korff were prepared and ready for the eviction as this had been part of their overall scheme all along.  In advance of October 12, 2015, they had spoken with Sumner's estate attorney and his personal attorney,  had prepared the staff to barricade the premises and had hired an armed bodyguard to forcibly prevent Herzer from communicating with Sumner and to intimidate, threaten, and deter her from returning to her own residence.  Literally minutes after the eviction was effected on October 12, 2015, Tyler Korff surfaced in Los Angeles – even though he lived on the East Coast – to celebrate Herzer's eviction, the goal he and Shari had been working towards for a long time.  Meanwhile, the nurses celebrated Herzer's ouster by exchanging high fives and congratulating one another.

## I.    Shari Redstone Takes Immediate Control of Sumner's Businesses and Personal Wealth.

148.    Shari Redstone and Tyler Korff's scheme to evict Herzer – a critical step in their larger conspiracy to take control of Sumner's media empire – had succeeded. Herzer was illegally removed from the residence under threat of force, and never allowed to see or speak to Sumner again.

149.    With a distraught and disoriented Sumner unable to communicate and incapacitated, he likely did not even realize that his daughter – who he had stated over and over again should not part of his life – was now controlling his affairs.  With other goals in mind, Tyler Korff never even bothered to see Sumner – *he has never visited Sumner once since October 12, 2015 despite claiming that he did what he did for family.*

150.    It was at this point that the true underlying purpose for this conspiracy began to be implemented.  As Shari Redstone explained in her October 15, 2015 email Tyler Korff confirmed that it was now time for Sumner "*to undue [sic] all of the legal documents, letters and affidavits that he done against me.*"

151.    Shari Redstone and Tyler Korff wasted no time in this respect.  On October 16, 2015, just four days after Herzer was evicted from Sumner's home, they

43

1    caused Sumner's Fortieth Amendment and Complete Restatement to his Estate Plan

2    to be executed.  By doing so, Shari and Tyler completely removed the millions of

3    dollars in bequests to Herzer, her three children and others that had existed since 2011,

4    thereby completely reversing Sumner's prior documented wishes.

5         152.   Shari Redstone – rather than focus on Sumner's health and true

6    intentions – also wasted little time on effecting her corporate takeover goals.  On

7    December 11, 2015, Shari Redstone prepared and sent to herself a letter that

8    fraudulently purported to have been sent by Sumner.  The letter fraudulently and

9    incredibly stated that it was Sumner's "intention that you succeed me as the non-

10   executive Chair of the Boards of Directors of Viacom and CBS after my death,"

11   contradicting clear statements Sumner had made over decades rejecting the notion

12   that Shari should succeed Sumner as the chair of his companies.

13        153.   Shari Redstone hoped the December 11 letter would cause the public and

14   all other interested parties to believe that Sumner had experienced a sudden change

15   of heart since just five months earlier when Shari reported to Tyler in July 2015 that

16   "*your grandfather says I will be chair over his dead body*."  In reality, Sumner did

17   not authorize the letter nor approve its contents, and just as he stated in letters back in

18   2007 and 2014, Sumner continued to believe that Shari "lacked the requisite business

19   judgment and abilities to serve as Chair of Viacom or CBS" or "as chairman of the

20   three companies."

21        154.   On January 12, 2016, Shari Redstone sent another letter that again

22   fraudulently purported to have been prepared and approved by Sumner.  It stated "I

23   know I have asked you to help me return everything to the way it was before Sydney

24   and Manuela entered my life" and requested that Shari make sure that "everything

25   that I described in my December 11, 2015 letter to you has been undone (or is being

26   undone)."

27        155.   With firm control over Sumner's ability to communicate – who was

28   essentially a puppet by this time – Shari Redstone also began to take measures to

44

FIRST AMENDED COMPLAINT

remove any of Sumner's long-time confidantes and business associates who resisted her takeover efforts. Initially, Shari caused Sumner's estate plan to be amended to provide that upon Sumner's death, his entire 80% ownership interest of NAI would fall into the control of the seven trustees of the NAI Trust, which Shari has reconstituted with herself, Tyler Korff, her daughter Kimberlee and her artist friend Jill Krutick to ensure majority control. Thus, when Sumner dies, Shari will have complete control of NAI and its controlling stake in both Viacom and CBS.

156. But Shari Redstone was not willing to wait until her father's death to gain control of Viacom and CBS. As part of a scheme to eliminate her rivals, and Sumner's longtime confidantes, including Philippe Dauman and George Abrams, Shari created and disseminated further fraudulent communications that falsely purported to be sent by Sumner. On or around May 16, 2016, Shari drafted a letter purporting to be sent by Sumner. The letter purported to express Sumner's desire to replace Dauman and Abrams as the trustees of the Sumner M. Redstone National Amusements Inc. Trust ("NAI Trust") – the trust holding Sumner's entire ownership interest in NAI, Viacom and CBS – as well as from their positions as directors on the board of NAI.

157. On or around May 16, 2016, Shari Redstone also falsely represented to Michael Tu – an attorney at the Los Angeles offices of Orrick, Herrington & Sutcliffe, LLP who had been referred to her by her own lawyer, Robert Klieger – that Sumner desired to hire him to send the letters that Shari had drafted and to help remove Dauman, Abrams and others from their positions as trustees and directors. Shari also enlisted Sumner's already financially-beholden household staff members to purportedly witness the signature on the letter she wrote. No disinterested third party or attorney has ever witnessed any of Sumner's signatures. Tellingly, in response to questions later posed by a Viacom director, Tu refused to disclose whether or not he had ever met or spoken with Sumner personally.

158. On May 20, 2016, at Shari Redstone's direction, Tu faxed the fraudulent

FIRST AMENDED COMPLAINT

letters to Dauman and Abrams, as well as to Viacom and CBS. Sending the letters purporting to be from Sumner effectively removed Dauman and Abrams from their positions on the NAI board and as trustees of the NAI Trust. The reactions by Dauman, Abrams and the board of Viacom were swift and unequivocal: these communications were Shari Redstone's doing, not Sumner's.

159. Through a spokesman, Dauman immediately issued a statement that same day: "These steps are invalid and illegal. They are a shameful effort by Shari Redstone to seize control by unlawfully using her ailing father Sumner Redstone's name and signature. As she knows and as court proceedings and other facts have demonstrated, Sumner Redstone now lacks the capacity to have taken these steps. Sumner Redstone would never have summarily dismissed Philippe Dauman and George Abrams, his trusted friends and advisers for decades."

160. Abrams issued a statement echoing Dauman's shock at the actions purportedly taken by his longtime friend: "I have known and represented Sumner Redstone for over 50 years. I worked closely with him on the building of his theater chain, the acquisitions of Viacom, Paramount and CBS, and countless business matters relating to all three of those entities, as well as National Amusements. I have also handled many personal matters for Sumner. Above all, he is my friend. The Sumner Redstone I knew would never have taken this action. What is going on now is unsettling and sad."

161. The Board of Directors for Viacom also issued a similar statement accusing Shari of manipulating her father. "It is clear that Shari Redstone has isolated her father and put his residence on lockdown, which provides clear evidence of her exercise of undue influence. Despite many attempts by members of Viacom's board, including the lead independent director, to meet with Sumner they have been denied access."

162. When directors from the board of Viacom requested to meet Sumner in person to determine if his true wishes were being accurately represented in the letters

46

FIRST AMENDED COMPLAINT

Case 2:17-cv-07545-PSG-KS Document 162-3 Filed 04/28/18 Page 49 of 66 Page ID
Case 2:17-cv-07545-SG-KS Document 31-2 Filed 03/27/18 Page 49 of 85 Page ID #421
#:1739

1   purporting to be sent by Sumner, Shari Redstone unilaterally blocked the directors'

2   access to Sumner. Instead, Shari issued a curt statement of her own that alluded to

3   the concerns that Sumner himself had not made the decision to send the letters.

4   Shari's statement said only, "I fully support my father's decisions and respect his

5   authority to make them."

6       163.   Once Dauman and Abrams were removed as trustees and directors of the

7   NAI Trust and NAI, respectively, Shari replaced them with her allies. On May 24,

8   2016, Shari directed that a statement be issued purporting to have been approved by

9   Sumner and announcing that Dauman and Abrams' positions on the board of directors

10  of NAI would be filled by Shari's friend Jill Krutick – a former equity analyst and a

11  self-described abstract impressionist artist – and Shari's daughter and co-conspirator

12  Kimberlee Ostheimer.

13      164.   The May 24 statement also falsely indicated that Sumner had said: "This

14  is my trust and my decision. I have picked those who are loyal to me and removed

15  those who are not." Of course, Sumner himself never made such statements implying

16  that Dauman and Abrams – two men he had been friends with for over 30 and 50

17  years, respectively, and who had been instrumental in building his media empire –

18  had not been loyal to him, while Jill Krutick, someone whom Sumner had no prior

19  relationship with, somehow had been loyal to Sumner. In reality, it was Shari who

20  had "picked those who [were] loyal to [her] and removed those who [were] not."

21      165.   Shari Redstone was not finished publicly destroying the relationship

22  between her father and his longtime friends and advisors. Shari continued to send

23  additional fraudulent communications purporting to be sent by Sumner, included a

24  statement she caused to be issued on June 15, 2016 saying, "I no longer trust Philippe

25  [Dauman] or those who support him. I am determined to act in the best interests of

26  the company and all of its shareholders. I do not trust you or the current board to do

27  the same. So there is no doubt, Rob Klieger and Michael Tu are my attorneys and are

28  acting at my direction."

47

FIRST AMENDED COMPLAINT

166.  Of course, there was little doubt – and indeed significant evidence – confirming that Sumner was being manipulated by Shari Redstone.  And the notion that two lawyers less than half Sumner's age and who could not confirm ever having had a direct conversation with Sumner could replace Dauman and Abrams is ludicrous.  But Shari ensured there would be no way for anyone to find out – as to this day, Sumner has been incommunicado.

167.  Although Shari Redstone still claims that such communications were made by Sumner, there is documented evidence that Sumner could not have spoken or communicated with anyone in 2016 as he had completely lost the ability to speak, write or read.  The videotape of a surreal 15-minute deposition given by Sumner in April 2016 – which documents his complete lack of capacity and consists of a series of grunts and guttural noises – has been kept secret.  Based on the purported transcript read in open court – which in no way reflects these unintelligible babblings – Sumner could not answer the question, "What is your name?" and tried to use a board with letters on it to respond to yes or no questions, but with little success.  The press reported that to the extent Sumner attempted to speak during the deposition, his responses "sounded like grunts and moans."  Nonetheless, Shari Redstone continues to contend that it was Sumner, and not her, who sent a letter a few months later in June 2016 stating that "I no longer trust Philippe [Dauman] or those who support him. . . . Rob Klieger and Michael Tu are my attorneys and are acting at my direction."

168.  On information and belief, Shari Redstone also forged or had someone else forge Sumner's signature on these fraudulent communications.  The signatures on these communications do not resemble Sumner's earlier, more distinctive signatures, and instead are mere undulating lines.

169.  Judge Phelan of the Massachusetts probate court noted these potential forgeries.  As he stated in his ruling dated July 28, 2016, the most recent signatures purporting to be Sumner's signature appears to be "an undulating but essentially flat line."  *See Dauman v. Redstone*, No. NO16E0020QC, 2016 WL 4249567, at *3

48
FIRST AMENDED COMPLAINT

1  (Mass.Prob. & Fam.Ct.Dept. July 28, 2016).  These "flatline" signatures do not

2  resemble Sumner's prior signatures, or even the signatures that were made after

3  Sumner's health had declined precipitously in 2015.

4      170.   The following images are signatures affixed to fraudulent documents that

5  Shari has caused to be prepared since Herzer's removal in October 2015:

**October 16, 2015**

Fortieth Amendment to estate plan that removed bequests to Herzer



**December 18, 2015**

Letter granting Shari input on medical decisions



**June 20, 2016**

Declaration filed in support of Motion to Dismiss Dauman/Abrams lawsuit



**June 28, 2016**

Letter sent to former Viacom director Frank Salerno



49

171.   By contrast, the following images show what Sumner's signature looked like before Shari removed Herzer from his life and restricted all access to her father. The first example is taken from a letter Sumner wrote in 2007 stating "that Shari does not have the requisite business judgment and abilities to serve as chairman of the three companies."  The second example is taken from a 2011 amendment to the SMR trust to include a bequest to Herzer for the first time.  The third example is taken from the will that Sumner executed on July 19, 2014.

**2007**



The trustees should also feel free to express their views as to who is best qualified to serve as chairman of each company.

Sincerely,

Sumner M. Redstone

**2011**



IN WITNESS WHEREOF, the said Sumner M. Redstone has hereunto set his hand and seal this _17_ day of _August_, 2011.

Sumner M. Redstone, Settlor and Co-Trustee

**2014**



Signed at Beverly Hills, California, on July 19, 2014.

Sumner M. Redstone

FIRST AMENDED COMPLAINT

172.   To the present day, Shari Redstone continues today to send fraudulent communications purporting to be sent by Sumner, a man who cannot speak, write, read or take care of himself.  And Sumner himself has been completely shielded from his long-time friends and the public, who have not seen or heard from him.  Tragically, it is likely that no one will hear from Sumner ever again and that Shari will only give up this charade once Sumner's passes away and she receives his 80% control of NAI – or, on other words, only when she achieves, contrary to Sumner's well-documented wishes, complete ownership and control over CBS and Viacom, the goal she has had in mind all along.

**J.      Shari Redstone Causes Sumner to Hire Her Personal Attorney to File a Frivolous Elder Abuse Complaint Against Herzer.**

173.   Shari Redstone has been able to buy off most of her enemies by agreeing to pay exorbitant amounts.  Accordingly, Dauman, Abrams and Salerno have all agreed to give up their issues in return for payments exceeding $70 million.  But Herzer has not.

174.     To continue her scheme of literally destroying all of Sumner's friends and confidantes – which Shari Redstone views as her enemies – she has arranged for her personal attorney, Robert Klieger of Hueston Hennigan LLP, to represent both her and Sumner on issues relating to Herzer notwithstanding the obvious and inherent conflicts of interest.   The  notion that Sumner – who was in a joint defense arrangement with Herzer before October 12, 2015 and who now is purportedly adverse to her after October 12, 2015 as to the *exact same issues* – can be represented by Shari's attorney raises many ethical issues.

175.   It is also telling that Sumner did not know Klieger and had never used him before.  Neither Shari Redstone nor Klieger were apparently deterred by the fact that Sumner could not speak to confirm that he understood the nature of  the conflict of hiring the same attorney to represent both him and the daughter who he publicly feuded with for decades.

176.   When coupled with the fact that Shari Redstone even had Klieger elected to the Board of CBS and had the company gift him shares in the company on several occasions, the potential issues only further mount.   No rationale has ever been provided as to why Klieger – her personal litigation attorney – was qualified to be a board member of CBS and was entitled to these share grants.  Klieger has never been a board member of any company, much less a publicly-traded billion-dollar media company.   Despite this lack of relevant board or corporate experience, Klieger holds one of the fifteen seats on the board of one of the world's largest media companies.

177.   It is hard to imagine a greater conflict of interest but since Sumner is the helpless victim, the ethical schism goes largely ignored.  Shari Redstone has litigated the elder abuse case in Sumner's name, while Shari's attorneys pretend they are working for Sumner even though they receive their instructions through Shari or the nurses bribed by and loyal to Shari.   Since Sumner does not have a conservator or a guardian ad litem, Shari is able to control this Wizard of Oz situation.

178.   Shari Redstone's continuing unethical legal attack against   Herzer comprises the final step in the scheme.  By doing so, she can continue to foster the charade that Sumner is acting independently and that he condones Shari's activities since October 12, 2015.

179.   But the reality is that he remains a puppet.  Immediately after the filing of the elder abuse lawsuit against Herzer, Sumner and Shari's attorney wrote to Herzer's counsel to inform them that Sumner would not testify in the action and would not otherwise be participating in any meaningful way in the lawsuit that had just been filed in his name.  Although his lawyers acknowledged that Sumner could not speak or communicate his answers to questions, they maintained that it was Sumner alone who had made the allegations in a salacious, 31-page complaint.  Ironically, less than two months later, Sumner's attorneys represented to a Massachusetts court that Sumner's health was stable in August 2016 – only further mocking the legal system.

180.   Herzer's resulting damages have been significant and continue to accrue.

Case 2:17-cv-07545-RSG-KS Document 162-3 Filed 04/28/18 Page 55 of 66 Page ID
Case 2:17-cv-07545-RSG-KS Document 51-2 Filed 03/27/18 Page 54 of 65 Page ID #:427
#:1745

1   She has been forced to spend millions of dollars in attorney's fees defending herself

2   against this entirely frivolous lawsuit that has been improperly filed in Sumner's name

3   at Shari's direction.

4   181.   The massively conflicted representation exposes a large lacuna in the

5   legal system which allowed an estranged daughter to force her own attorneys on a

6   feeble and incapacitated man to accomplish her criminal objectives at Herzer's

7   expense as well as Sumner's, since October of 2015.  The continued propping up of

8   Sumner Redstone in his individual capacity prevents any other person including the

9   Court from examining whether or not Sumner has been fully informed regarding the

10  conflicts of the joint representation and whether he has knowingly and voluntarily

11  waived that conflict.  This legal charade has gone on long enough and, should Sumner

12  pass, she will have accomplished this travesty, without any knowledge or awareness

13  by Sumner whatsoever – a tragic end to his life and to his legacy.

14

15                          **FIRST CLAIM FOR RELIEF**

16                      **VIOLATION OF RICO (18 U.S.C. § 1962(c))**

17                           **(Against All Defendants)**

18  182.   Plaintiff Herzer hereby incorporates by reference as though fully set

19  forth in full herein, paragraphs 1 through 181 of this First Amended Complaint.

20  183.   Defendants Shari Redstone and Tyler Korff are persons within the

21  meaning of 18 U.S.C. § 1961(3).

22  184.   At all relevant times, Defendant Shari Redstone – along with her family

23  members (including Defendant Tyler Korff, Brandon Korff, Kimberlee Ostheimer

24  and Jason Ostheimer), members of Sumner's nursing and household staff (including

25  but not limited to Jeremy Jagiello, Joseph Octaviano, Isileli Tuanaki, Faleolo Toia,

26  Igor Franco and Gloria Mazzeo), and Shari Redstone's attorneys and spokespersons

27  – formed an association-in-fact enterprise that functions as a continuing unit with the

28  common purpose of illegally cutting out Sumner's friends, companions and business

Case 2:17-cv-07545-PSG-KS Document 62-3 Filed 04/28/18 Page 56 of 66 Page ID
Case 2:17-cv-07545-PSG-KS Document 51-2 Filed 03/27/18 Page 55 of 65 Page ID #:428
#:1746

1 | associates from Sumner life as a direct means of gaining control of his estate plan and

2 | his media companies, including NAI, CBS and Viacom.

3 |     185.   Defendants each individually and separately conducted, operated,

4 | managed, directed, controlled and participated in the conduct of the enterprise.

5 |     186.   Defendants each did so through a pattern of racketeering activity within

6 | the meaning of 18 U.S.C. § 1961(1)(A) and 18 U.S.C. § 1961(5) by multiple related

7 | and continuous predicate acts of (i) commercial bribery in violation of California

8 | Penal Code § 641.3, (ii) mail fraud in violation of 18 U.S.C. § 1341, (iii) wire fraud

9 | in violation of 18 U.S.C. § 1343, (iv) witness bribery in violation of 18 U.S.C. § 201,

10 | and (v) witness tampering in violation of 18 U.S.C. § 1512.

11 |     187.   In violation of California Penal Code § 641.3, Defendants and other

12 | members of the enterprise described above were bribed and/or solicited bribes in

13 | exchange for using their position of employment – namely their intimate access to

14 | and trust of Sumner – corruptly for the benefit of Defendants.  Specifically,

15 | Defendants and members of the nursing and household staff engaged in the following

16 | unlawful acts, which are punishable under state law by imprisonment for more than

17 | one year:

18 |     • On or about October 28, 2014 – as alleged above in paragraphs 85-95 –

19 |      Defendants Shari Redstone and Tyler Redstone paid a bribe to nurse

20 |      Giovanni Paz in an amount just under $9,000 in exchange for Paz's

21 |      cooperation with providing confidential information about Sumner and

22 |      Herzer to Defendants in violation of the employment agreement Paz had

23 |      signed;

24 |     • Between October 2014 and continuing today, including on or about April

25 |      28, 2015 and October 12, 2015 – as alleged above in paragraphs 96-100

26 |      – Defendants Shari Redstone and Tyler Redstone bribed nurse Jeremy

27 |      Jagiello with gifts, payment of attorney's fees, promises of job security,

28 |      increased hours and unlimited overtime, and other things of value in

exchange for Jagiello's cooperation with providing confidential information about Sumner and Herzer to Defendants in violation of the employment agreement Jagiello had signed, and also in exchange for attempting to unduly influence and lie to Sumner regarding Herzer;

- In a July 18, 2015 email – as alleged above in paragraphs 96-97 – nurse Joseph Octaviano solicited a bribe from Defendants Shari Redstone and Tyler Korff in exchange for his continued provision of confidential information about Sumner and Herzer to Defendants in violation of the employment agreement Octaviano had signed.

188.    In violation of 18 U.S.C. § 1341 and § 1343, Defendants and other members of the enterprise described above engaged in repeated and continuing acts of mail and wire fraud.  Defendants intentionally and knowingly transmitted and/or caused to be transmitted fraudulent communications in furtherance of their scheme using the U.S. Postal Service and by means of a wire in interstate commerce with specific intent to deceive.  Defendants intentionally and knowingly made false representations that Sumner had knowingly made, understood and authorized several communications to be sent on his behalf, when in fact Sumner had not made, understood or authorized the communication.  These communications were mailed, faxed, emailed to others by Defendants and other members of the enterprise described above, including the spokespersons and lawyers Shari hired to purportedly speak on Sumner's behalf.

189.    Specifically, Defendants and other members of the enterprise above engaged in the following unlawful acts:

- On December 11, 2015 – as alleged above in paragraphs 18-19 and 152-153 – Defendant Shari Redstone knowingly caused to be mailed, faxed and emailed from Sumner's home in California to Shari in Massachusetts a fraudulent letter falsely representing *inter alia* that Sumner expressed the desire that Shari succeed Sumner as the non-Executive Chair of CBS

55

FIRST AMENDED COMPLAINT

Case 2:17-cv-07545-RSCKS Document 162-3 Filed 04/28/18 Page 58 of 66 Page ID
Case 2:17-cv-07545-SGRSC Document 3150 Filed 03/27/18 Page 59 of 65 Page ID #:430
#:1748

1  and Viacom, and that Sumner expressed the desire that all of the trust-
2  related documents he had executed over the past five years be considered
3  withdrawn and void.  In fact, Sumner never expressed any such desires.
4  The letter also falsely represented that Sumner understood and agreed
5  with each point set forth in the letter.

6  • On January 12, 2016 – as alleged above in paragraphs 154-155 –
7  December Shari Redstone knowingly caused to be mailed, faxed and
8  emailed from Sumner's home in California to Shari in Massachusetts, as
9  well as Leah Bishop and David Andelman, two separate fraudulent
10  letters.  The first letter falsely representing that Sumner had written and
11  authorized the December 11, 2015 letter, and that Sumner desired that
12  all of his trust and related estate planning documents be sent to Shari.
13  The second letter falsely represented that Sumner had expressed that it
14  was his intention, and it had always been his intention, that Shari "serve
15  as the sole Chairman of both companies," namely CBS and Viacom.

16  • On or around May 20, 2016 – as alleged above in paragraphs 156-162 –
17  Defendant Shari Redstone knowingly caused to be mailed, faxed and
18  emailed to attorney Michael Tu a fraudulent letter falsely representing
19  that Sumner had expressed the desire to make drastic changes to the
20  governance of both his media empire and estate plan by removing several
21  trustees of his trust and directors of his companies – including Philippe
22  Dauman, George Abrams and Frederic Salerno.  In fact, Sumner had
23  never expressed any such desires, and Shari herself had drafted the letter.
24  Michael Tu subsequently faxed the fraudulent communication to
25  Dauman, Abrams, Salerno and other members of the Viacom board.

26  • On or about May 24, 2016 – as alleged above in paragraphs 163-164 –
27  Defendant Shari Redstone caused to be mailed, faxed and emailed to
28  spokesman Mike Lawerence a fraudulent statement falsely representing

FIRST AMENDED COMPLAINT

that Sumner had expressed the desire to replace Dauman and Abrams with Shari's daughter Kimberlee Ostheimer and Shari's friend Jill Krutick, and that Sumner had made the statement that "[t]his is my trust and my decision. I have picked those who are loyal to me and removed those who are not." In fact, Sumner had not chosen Ostheimer or Krutick – Shari had – and Sumner had not made the statement attributed to him.

- On or about June 15, 2016 – as alleged above in paragraphs 165-166 – Defendant Shari Redstone caused Sumner Redstone's longtime assistant Gloria Mazzeo and spokesman Mike Lawerence to email a fraudulent letter to, respectively, Frederic Salerno and The New York Times. The letter falsely represented that Sumner had made the statement that he "no longer trust[ed] Philippe [Dauman] or those who support him," that his "wishes are being ignored," that he "do[es] not trust [Salerno]" and that "Rob Klieger and Michael Tu are [his] attorneys and are acting at [his] direction." In fact, Sumner had not made the statement attributed to him nor authorized it to be sent on his behalf.

190. Also in violation of 18 U.S.C. § 1343, over the course of an approximately 12-month period, Defendants sent thousands of text messages, emails, and phone calls to members of the Sumner's household and nursing staff and other individuals. In these communications, Defendants intentionally and knowingly made false and misleading representations about Herzer, and then bribed, incentivized, and instructed the staff to pass along to Sumner the false and misleading representations in an effort to oust Herzer from Sumner's life. Defendants also made fraudulent communications to others through emails and other forms of communication falsely stating that Herzer and Holland had unduly influenced Sumner, including by forcing Sumner to make certain statements to his attorneys against his will and preventing Sumner from communicating his friends and family.

191. In violation of 18 U.S.C. § 201, Defendants Shari Redstone and Tyler

57

Korff as well as other members of the enterprise described above gave, offered and promised money and other things of value to several witnesses in exchange for favorable testimony the witnesses promised to or did provide in connection with various court proceedings, and also for promises to not voluntarily cooperate with anyone in the prosecution of any legal actions against Defendants.

192.   In violation of 18 U.S.C. § 1512, Defendants Shari Redstone and Tyler Korff as well as other members of the enterprise described above intimidated, threatened or corruptly persuaded witnesses to influence and/or prevent their testimony in connection with various official proceedings.

193.   Specifically, Defendants and other members of the enterprise described above engaged in the following unlawful acts in violation of both 18 U.S.C. § 201 and 18 U.S.C. § 1512:

- On or about August 12, 2016, Defendant Shari Redstone caused her attorneys to draft and execute on Sumner's behalf a sham settlement agreement with Giovanni Paz.  In addition to the nearly $9,000 Shari had already paid Paz two years earlier, the sham settlement agreement provided Paz with an additional $30,000.  Shari caused the money to be paid to Paz not to release any illusory claims for overtime pay, but rather to induce Paz to agree to a non-cooperation provision that prohibited from voluntary cooperating with prosecution of legal action, civil or criminal, by any person (*i.e.*, Herzer) against Shari and other members of her family.

- Similarly, on or about August 18, 2016, Defendant Shari Redstone caused her attorneys to draft and execute on her and Sumner's behalf a settlement agreement with  Philippe Dauman, George Abrams, Frederic Salerno and other former members of the Viacom board who had been ousted by Shari Redstone.  Dauman alone received $58 million (not including an additional $20 million in Viacom bonuses) while the others

58

received undisclosed amounts. In exchange for the money they received, the parties agreed to drop their claims of undue influence against Shari, agreeing to not challenge the corporate moves orchestrated by Shari, and agreeing to "not knowingly encourage or voluntarily assist any third-party asserting any of the challenges set forth in this paragraph."

- Similarly, on or about August 18, 2016, Defendant Shari Redstone caused her attorneys to draft and execute a settlement agreement with one of Sumner's former nurses, Ben. Ferrer. Ferrer – who had his attorney's fees paid by Sumner and Shari –was fired by Shari shortly after giving a deposition in which he expressed concerns about Jeremy Jagiello's manipulation of Sumner. Shari subsequently caused her lawyers to offer on Sumner's behalf to pay him $80,000 in a sham settlement agreement (based on illusory claims for overtime pay that Ferrer had never threatened to assert) in order to corruptly influence him to sign a declaration exonerating Shari of any wrongdoing or undue influence of Sumner. On the day that Ferrer showed up to sign the agreement, he was presented with for the first time and asked to sign the declaration. Ferrer testified in a subsequent deposition that he felt financial pressure to sign the declaration and that he believed that he may not have received the $80,000 payment if he refused to execute the declaration. Ferrer further testified that he was never made aware that the lawyers who had drafted the settlement agreement and the declaration represented Shari Redstone as well as Sumner.

- On or about August 28, 2016, Sumner's granddaughter and Shari's niece Keryn Redstone was promised by Shari's lawyer that she would be treated on equal footing as Sumner's four other grandchildren with respect to her inheritance. In exchange, on information and belief, Keryn executed a settlement agreement with a similar non-cooperation

provision prohibiting her from cooperating with third parties like Herzer in the prosecution of claims against Shari and her children.

- On information and belief, Defendant Shari Redstone corruptly influenced nurses Jeremy Jagiello and Joseph Octaviano by giving them money, increased working hours and/or other things of value in exchange for testimony, including false declarations they have submitted against Herzer.

194.  These intentional acts of commercial bribery, mail fraud, wire fraud, witness bribery and witness tampering constitute a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

195.  By reason of the violations of 18 U.S.C. §1962(c) described above, Herzer has suffered concrete, definite and tangible injuries including but not limited to having bequests to her and her children being deleted from Sumner's trust and incurring attorney's fees to defend against frivolous legal actions that are fraudulently being prosecuted in Sumner's name.  Herzer is entitled to damages in an amount to be determined at trial, including treble damages and attorney's fees.

## SECOND CLAIM FOR RELIEF
### VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT (18 U.S.C. §§ 2511, 2520)
#### (Against All Defendants)

196.  Herzer hereby incorporates by reference as though fully set forth in full herein, paragraphs 1 through 195 of this First Amended Complaint.

197.  In violation of 18 U.S.C. §2511(1)(a), Defendants willfully conspired with and procured third parties to intercept and endeavor to intercept Herzer's wire, oral and electronic communications without Herzer's knowledge, authorization, or consent .

198.  In violation of 18 U.S.C. §2511(1)(b), Defendants willfully conspired

with and procured third parties to use and endeavor to use concealed electronic devices (including cell phones, which communicate by transmitting signals through wires) to make video and audio recordings of Herzer's private, oral communications. These recordings were all made in Sumner's home, a private setting where Herzer was living and which is not accessible to the general public.

199.   In violation of 18 U.S.C. §2511(1)(c), Defendants intentionally disclosed and endeavored to disclose to others the contents of Herzer's wire, oral and electronic communications that Defendants had procured the third parties to intercept. Defendants disclosed and endeavored to disclose the communications while knowing or having reason to know that the recordings and other intercepted communications had been illegally procured.

200.   In violation of 18 U.S.C. §2511(1)(d), Defendants intentionally used and endeavored to use the contents of Herzer's wire, oral and electronic communications that Defendants had procured the third parties to intercept.  Defendants disclosed and endeavored to disclose the communications while knowing or having reason to know that the recordings and other intercepted communications had been illegally procured.

201.   Herzer did not authorize or consent to the interception, use or disclosure of her wire, oral or electronic communications by anyone, much less the third parties that conspired with and were procured by Defendants.

202.   Herzer has suffered and continues to suffer injury as a result of defendants' unlawful interception of oral communications as described in above, including by being disinherited and removed from Sumner's estate plan.

203.   As a direct result of defendants' conduct, Herzer has been harmed in an amount to be proven at trial.

/ / / /

/ / / /

/ / / /

/ / / /

FIRST AMENDED COMPLAINT

## THIRD CLAIM FOR RELIEF

### CIVIL CONSPIRACY TO DEFAME

### (Against All Defendants)

204.   Plaintiff Herzer hereby incorporates by reference as though fully set forth in full herein, paragraphs 1 through 203 of this First Amended Complaint.

205.   Defendants conspired with each other and members of Sumner's nursing and household staff to intentionally, maliciously, and knowingly make disparaging, untrue, and slanderous statements about Herzer to Sumner Redstone and others.

206.   The false statements include without limitation representations that Herzer had "stolen millions" from Sumner, had prevented or threatened to prevent Sumner from communicating with his friends and family, had forced Sumner to make statements to his attorneys against his will, had verbally and physically abused Sumner, had planned to fire the only nurses that could assist Sumner to communicate with others, had forged a letter to Sumner from Holland, had installed cameras in Sumner's home without his permission, as well as a number of other complete fabrications without any basis in fact whatsoever.

207.   By and through the actions set forth above, Defendants agreed to, entered into, and formed a conspiracy to engage in unlawful conduct designed to injure Herzer by tricking Sumner and his attorneys and advisors into believing Herzer had unduly influenced Sumner, had lied to Sumner and had stolen money from Sumner.

208.   Defendants engaged in overt acts pursuant to, and in furtherance of, said conspiracy, including but not limited to making the statements themselves and affirmatively encouraging others to make the false statements to Sumner.

209.   The actions of Defendants were committed with willfulness, wantonness, malice, and oppression, entitling Plaintiff to an award of actual, compensatory, and punitive damages.

210.   Herzer did not discover facts showing that Defendants made and directed the making of the false statements until August 2017 when Defendant Tyler Korff

62

1   produced pursuant to a court order a wealth of email and text message conversations

2   that revealed the existence of Defendants' unlawful conspiracy to defame Herzer.

3   211.   Before that time, Defendants concealed their involvement in directing

4   the making of these false statements by masking the nature of the close relationship

5   between the household staff, nurses and Defendants, by attempting to avoid written

6   communications and by providing explicit instructions to the nurses over the phone,

7   and intentionally and knowingly failing to produce responsive documents in other

8   litigation.

9   212.   Moreover, prior to the August 2017 production, Herzer was not aware

10  that Defendants had made and conspired to make defamatory statements directly to

11  Sumner's business associates and attorneys, including statements that Herzer dictated

12  Sumner's statements to his attorney and verbally abused him if he deviated, that she

13  had threatened to have Sumner's family members arrested and sued if they visited

14  him in the hospital, and that she had forced Sumner to send letters against his will.

15  213.   As a direct result of these defamatory statements, bequests to Herzer and

16  her children were removed from Sumner's estate plan, causing Herzer to suffer

17  damages in an amount to be proven at trial.

18

19  **PRAYER FOR RELIEF**

20  WHEREFORE, Herzer seeks a judgment in her favor against Defendants and

21  an order granting the following relief:

22  1.   That Herzer be awarded compensatory damages;

23  2.   That Herzer be awarded treble damages under RICO ;

24  3.   That Herzer be awarded her attorneys' fees under ECPA;

25  4.   That Herzer be awarded punitive damages in an amount to be proven at

26  trial for Defendants' willful and malicious conduct;

27  5.   That Herzer be awarded exemplary damages in an amount to be proven

28  at trial for Defendants' willful and malicious conduct; and

FIRST AMENDED COMPLAINT

1      6.     That Herzer be awarded such further relief as the Court deems just and

2 proper.

4 DATED: March 27, 2018      Respectfully submitted,

5 Dan K. Webb
Stephen R. Smerek
6 WINSTON & STRAWN LLP

8 By:_____ /s/ Dan K. Webb_____
Dan K. Webb
9 Attorneys for Plaintiff Manuela Herzer

10 Ekwan E. Rhow
11 Hernán D. Vera
Nithin Kumar
12 BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
13

14 By:_____ /s/ Ekwan E. Rhow_____
Ekwan E. Rhow
15 Attorneys for Plaintiff Manuela Herzer

17 Ronald Richards
LAW OFFICES OF RONALD RICHARDS
18 & ASSOCIATES, A.P.C.

20 By: _____ /s/ Ronald Richards_____
Ronald Richards
21 Attorneys for Plaintiff Manuela Herzer

64
FIRST AMENDED COMPLAINT