Dan K. Webb (admitted *pro hac vice*)
dwebb@winston.com
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
Tel: (312) 558-5600 / Fax: (312) 558-5700

Stephen R. Smerek (SBN 208343)
ssmerek@winston.com
WINSTON & STRAWN LLP
333 South Grand Ave., 38th Floor
Los Angeles, CA 90071-1543
Tel: (213) 615-1700 / Fax: (213) 615-1750

Ekwan E. Rhow (SBN174604)
erhow@birdmarella.com
Hernán D. Vera (SBN 175149)
hvera@birdmarella.com
Nithin Kumar (SBN 300607)
nkumar@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Tel: (310) 201-2100 / Fax: (310) 201-2110

Ronald Richards (SBN 176246)
ron@ronaldrichards.com
P.O. Box 11480
Beverly Hills, CA 90213
Tel: (310) 556-1001 / Fax: (310) 277-3325

Attorneys for Plaintiff Manuela Herzer

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| MANUELA HERZER, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>SHARI REDSTONE, an individual; TYLER KORFF, an individual; and DOES 1-10, inclusive,<br><br>Defendants. | CASE NO. 2:17-cv-07545-PSG-KSx<br><br>**PLAINTIFF MANUELA HERZER'S OPPOSITION TO DEFENDANT SHARI REDSTONE'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**<br><br>Date:   July 9, 2018<br>Time:   1:30 p.m.<br>Dept.:   6A |

# **TABLE OF CONTENTS**

Page

I.    INTRODUCTION ........................................................................................... 1

II.   FACTUAL ALLEGATIONS ......................................................................... 2

III.  OTHER ACTIONS INVOLVING HERZER AND DEFENDANTS ............. 5

      A.   The State Court Actions Filed by Herzer ........................................... 5

      B.   Victims of the Unlawful Scheme File Similar Claims ........................ 7

IV.   LEGAL STANDARD ................................................................................... 9

V.    ARGUMENT .............................................................................................. 10

      A.   Herzer Has Standing Under the RICO Act ...................................... 10

            1.   Interference with An Expected Inheritance Constitutes a
                 Cognizable Injury Under the RICO Act .................................. 10

            2.   Attorney's Fees Incurred by Reason of Defendants'
                 Unlawful Conduct Also Constitutes a Cognizable Injury ......... 14

            3.   Herzer Has Adequately Alleged That Her Injuries Were
                 Proximately Caused by Defendants' Unlawful Conduct .......... 15

            4.   Herzer's Injuries Are Not "Too Remote" ................................ 18

      B.   Herzer's Defamation Claim Is Not Time-Barred .............................. 19

      C.   Abstention Is Not Warranted ............................................................ 20

            1.   There Are No "Exceptional Circumstances" to Justify a
                 Stay or Dismissal Under *Colorado River* .............................. 20

            2.   The *Colorado River* Factors Weigh in Favor of
                 Jurisdiction .......................................................................... 21

VI.   CONCLUSION ........................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................... 9

*Bankers Trust Co. v. Rhoades*,
    859 F.2d 1096 (2d Cir. 1988) ...................................................... 14, 18

*Beckwith v. Dahl*,
    205 Cal. App. 4th 1039 (2012) ........................................................ 12

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................... 9

*Burger v. Kuimelis*,
    325 F. Supp. 2d 1026 (N.D. Cal. 2004) ........................................... 15

*Canyon County v. Syngenta Seeds, Inc.*,
    519 F.3d 969 (9th Cir. 2008) ........................................................... 10

*Colo. River Water Conservation Dist. v. United States*,
    424 U.S. 800 (1976) ............................................................. 20, 21, 25

*Diaz v. Gates*,
    420 F.3d 897 (9th Cir. 2005) (en banc) .................................... *passim*

*Dunmore v. Dunmore*,
    2013 WL 5569979 (E.D. Cal. Oct. 9, 2013) .................................... 15

*Finch v. Finch*,
    2009 WL 310776 (S.D. Ill. Feb. 9, 2009) .................................. 11, 13

*Handeen v. Lemaire*,
    112 F.3d 1339 (8th Cir. 1997) ........................................................ 14

*Jimenez v. Rodriguez-Pagan*,
    597 F.3d 18 (1st Cir. 2010) ............................................................. 20

*Kahn v. Bower*,
    232 Cal.App.3d 1599 (1991) ........................................................... 19

*King v. Wang*,
    2015 WL 4207076 (S.D.N.Y. July 13, 2015)......................................................... 12

*King v. Wang*,
    663 Fed. App'x 12 (2d Cir. 2016) ................................................................... 13, 22

*Lauter v. Anoufrieva*,
    642 F. Supp. 2d 1060 (C.D. Cal. 2009)........................................................... 15, 16

*Marshall v. Marshall*,
    547 U.S. 293 (2006) ......................................................................................... 12

*Mendoza v. Zirkle Fruit Co.*,
    301 F.3d 1163 (9th Cir. 2002) ............................................................. 10, 16, 18

*Menjivar v. Trophy Props. IV DE, LLC*,
    2006 WL 2884396 (N.D. Cal. Oct. 10, 2016) .................................................. 15

*Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983) .......................................................................................... 20

*New Orleans Pub. Serv., Inc., v. Council of City of New Orleans*,
    491 U.S. 350 (2013) ....................................................................................... 20

*Ogden v. Wells Fargo Bank, N.A.*,
    674 Fed. App'x 650 (9th Cir. 2017) ................................................................ 15

*R.R. St. & Co. v. Transp. Ins. Co.*,
    656 F.3d 966 (9th Cir. 2011) ..................................................................... 21, 25

*Schlegel v. Wells Fargo Bank, N.A.*,
    720 F.3d 1204 (9th Cir. 2013) ......................................................................... 9

*Seneca Ins. Co., Inc. v. Strange Land, Inc.*,
    862 F.3d 835 (9th Cir. 2017) ................................................................*passim*

*Shulman v. Group W Prods., Inc.*,
    18 Cal. 4th 200 (1998)................................................................................... 23

*Stochastic Decisions, Inc. v. DiDomenico*,
    995 F.2d 1158 (2d Cir.1993) ......................................................................... 14

*Summerfield v. Strategic Lending Corp.*,
    2010 WL 3743897 (N.D. Cal. Sept. 20, 2010)................................................. 14

iii

*Thomas v. Baca*,
  308 Fed. App'x 87 (9th Cir. 2009) .......................................................... 14

*Travelers Indem. Co. v. Madonna*,
  914 F.2d 1364 (9th Cir. 1990) ...........................................................21, 22

**Decisions in Related Proceedings**

*In re Advance Health Care Directive of Sumner M. Redstone*,
  No. BP168725, 2016 WL 2620287 (Cal. Super. Ct. May 9, 2016) ...................5, 6

*Dauman v. Redstone*,
  2016 WL 4249567 (Mass. Prob. & Fam. Ct. July 28, 2016) ................................ 8

**Statutes**

18 U.S.C. §§ 1961 *et seq.* ...................................................................*passim*

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

As alleged in her First Amended Complaint, Plaintiff Manuela Herzer ("Ms. Herzer") is the victim of an organized scheme overseen by Defendants Shari Redstone and Tyler Korff.  Pursuant to that illicit plan, Defendants isolated Sumner Redstone from Herzer and his other close friends and associates and then took control of his estate plan and media empire.  The end goal of their enterprise is now being played out in real time in the ongoing and highly-publicized battle, in which Shari Redstone is now attempting a corporate takeover of both CBS and Viacom for her own benefit.

Despite Defendants' arguments to the contrary, Ms. Herzer is a proper plaintiff here and has standing to assert her claims.  Under controlling Ninth Circuit precedent, the fact that the majority of Ms. Herzer's damages are "prospective" is not legally significant.  Neither is the fact that they are based on entitlements that Herzer had in Sumner's trust.  Simply put, the law more than amply provides Ms. Herzer standing to pursue her claims and associated damages under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1961 *et seq*.

Defendants' remaining attacks are based on the assumption that Herzer is forum-shopping or that her claims are somehow redundant of claims brought in prior actions.  These arguments are similarly flawed.  A careful review of the factual allegations – including, most notably, the shocking admissions by Defendants found in the document production by Tyler Korff in August 2017 – shows clearly that Ms. Herzer is only seeking to protect her rights and to remedy the wrongs now uncovered in these documents.  She has the right to do so through these claims and in this court.

For these and the other reasons set forth herein, Defendant Shari Redstone's motion to dismiss should be denied.[1]

---

[1]   Ms. Herzer has also filed an opposition to Defendant Tyler Korff's Motion to Dismiss.  Although many of Defendants' arguments overlap, this brief addresses the arguments primarily made by Shari Redstone in her Motion to Dismiss, while Ms. Herzer's other opposition brief addresses the arguments primarily made by Korff.

1

## II.   FACTUAL ALLEGATIONS

The First Amended Complaint ("FAC") (Dkt. 51) alleges that Defendant Shari Redstone ("Shari Redstone") and her son Tyler Korff ("Korff") orchestrated a scheme to seize control of billionaire Sumner Redstone's "life and legacy in the final years of his life." FAC ¶¶ 2-3. Over the course of several decades, Sumner Redstone ("Sumner") built a vast media empire that came to include media giants CBS Corporation and Viacom Inc. To ensure that his companies would always be properly managed even after his time, Sumner installed clear directives in his estate plan that would control the line of corporate succession. *Id.* ¶ 4. Shari Redstone, however, refused to comply with her father's wishes to allow an independent group of seven hand-picked trustees to decide the control of Sumner's company. *Id.* ¶ 5. With the help of her son Tyler Korff and her other children, Shari Redstone began devising a "scheme to unravel his long-standing decisions and to ultimately take control of CBS and Viacom."[2] *Id.* As the FAC alleges in great detail, "[t]o effectuate her plan to take over Sumner's life and his companies, Shari sought first to isolate her father, then to systematically destroy the historical relationships he had built over the course of decades with those he trusted and who knew his true intentions." *Id.* ¶ 6.

The unlawful scheme, which first began sometime in 2014 when Sumner's health began to precipitously decline, progressed through several phases as Shari Redstone moved closer to her ultimate goal of taking control of her father's media empire. This was directly contrary to Sumner's wishes as, for decades, Shari and Sumner Redstone had publicly feuded, largely over the question of succession and

---

[2]   This scheme continues to the present day as recent events confirm. Contrary to the wishes that Sumner publicized when he was competent and articulate – namely that Viacom and CBS should always be separate companies – Shari, under the purported umbrella of Sumner's approval, has implemented a corporate attack on CBS with the goal to merge and the sell the combined entity. *See* William D. Cohan, *"It's the Story of a Person Who Was Mistreated by Her Father": Inside Shari Redstone's Twisted Plot to Bread CBS and Viacom*, VANITY FAIR (April 28, 2018), available at https://www.vanityfair.com/news/2018/04/shari-redstones-twisted-plot-to-breed-cbs-and-viacom/.

2

proper corporate governance. *Id.* ¶¶ 45-50.  As a result, Shari Redstone had limited access to her father and insight into his plans.

Knowing that a competent Sumner would never allow her to control Viacom or CBS, as Sumner's health began to decline, Shari Redstone, Korff and others including their attorneys began to infiltrate Sumner's personal life by secretly bribing and recruiting nurses and other staff members who worked in Sumner's residence.  *Id.* ¶ 6. Defendants used the vast information they were provided with to fashion a believable, yet patently false and defamatory, narrative about Ms. Herzer that Defendants then conveyed to Sumner's closest friends and advisors in an effort to turn them against Ms. Herzer. *See, e.g.*, *id.* ¶¶ 122.

Having purchased the loyalty of the nurses and household staff, Defendants coordinated their efforts to acquire confidential information about Ms. Herzer and drive a wedge between Ms. Herzer and Sumner, who, given his age and illness, was particularly susceptible to being deceived.  *Id.* ¶¶ 11-15, 67-147.  Acting at Defendants' behest, Sumner's nurses and household staff lied, pressured and led a vulnerable and confused Sumner to believe that Ms. Herzer did not care for him and needed to be evicted from Sumner's home and banished from his life.  *Id.* ¶ 11.  After months of this unlawful espionage and constant brainwashing, Defendants' efforts finally paid off after the nurses conveyed several lies to Sumner, including that Ms. Herzer had "stolen millions" from Sumner and was planning to fire the nurses who Sumner relied on to interpret his severely dysarthric speech.  *Id.* ¶¶ 139-144. Infuriated by the false information that the nurses had conveyed to him about Ms. Herzer, Sumner ordered that Ms. Herzer leave his residence.  *Id.* ¶ 144.

Immediately following Ms. Herzer's eviction, Defendants descended on the residence that they had rarely visited for the prior several years and began carrying out the next phase of their scheme.[3]  *Id.* ¶¶ 145-165.  Having removed Ms. Herzer and

---

[3]   Incredibly, despite claiming that he evicted Ms. Herzer so that he could see Sumner again, Korff has never bothered to visit his grandfather even once since

3

gained total access and control of Sumer's personal life, Defendants began executing fraudulent documents that began undoing the plans that Sumner had carefully implemented to protect his legacy and his friends and to ensure his directives for CBS and Viacom would be followed. *Id.* On October 15, 2015, just three days after Ms. Herzer's eviction, Shari Redstone wrote an email confirming her intentions to undo Sumner's plans: "***It would be good if we could get him to undue [sic] all of the legal documents, letters and affidavits that he done against me.***" *E.g., id.* ¶ 15, 150. With Sumner in an enfeebled state and isolated—not to mention in the care of nurses who had been bribed by Defendants—Shari Redstone and Tyler Korff had little trouble creating fraudulent documents that falsely represented that the instructions contained therein were made by Sumner when, in reality, he had no understanding or knowledge of the documents or their contents. *Id.* ¶¶ 152-159, 163-165. Shari Redstone and Korff first changed Sumner's advance health care directive to remove Ms. Herzer as Sumner's designated health care agent, as well as Sumner's estate plan.

Having eliminated Ms. Herzer from Sumner's life and taken control of his personal life, health and estate plan, Defendants now could use Sumner as their puppet to seize control of his media empire. In May 2016, Shari Redstone created a series of fraudulent letters that falsely represented that they reflected Sumner's wishes and had been authorized by him. *Id.* ¶¶ 156-158. Without any cognizable reason or advance notice, those communications purported to suddenly remove Sumner's decades-long friends and associates—including Philippe Dauman, George Abrams, Frederic Salerno and others—from their positions on the board of directors of Viacom, and more importantly, from their positions as trustees of the trust that Sumner had established to control his corporate ownership interests after his death. *Id.* By doing so, Defendants could then seize a controlling majority of the trustees that Sumner had hand-picked – which is precisely what has occurred. In the aftermath of Ms. Herzer's purported

---

2015. FAC ¶ 149.

eviction,  Shari Redstone executed fraudulent documents that falsely stated Sumner's desire to remove Dauman and Abrams, his close friends of over forty years, as trustees and replace them with Shari's daughter Kimberlee and personal friend (and artist) Jill Krutick.  *Id.* ¶ 156.

Shari Redstone's scheme has succeeded.  With Ms. Herzer ousted, Defendants are in complete control of Sumner's personal life and he has literally disappeared from public view.  And having entirely eliminated Sumner's closest friends and business associates from his estate plan and the other roles he had appointed them to, Defendants now fully control the trust that control the disposition of Sumner's corporate ownership interests and, as a consequence, have a means to seize complete control of CBS and Viacom, a scenario that is playing out in real time.[4]

## III.   OTHER ACTIONS INVOLVING HERZER AND DEFENDANTS

### A.   The State Court Actions Filed by Ms. Herzer

Prior to filing this action in federal court in October 2017, Ms. Herzer previously instituted three related proceedings in California state court.  ***First***, after being evicted from Sumner's residence, Ms. Herzer filed a petition in California probate court to invalidate Sumner's newly-executed health care directive that eliminated her involvement in his medical decision-making.  She filed this non-monetary claim solely over her concerns that Sumner's healthcare would be jeopardized.  (Dkt. 61, Ex. 1.)  In May 2016, the probate court dismissed Ms. Herzer's petition in an extremely limited ruling made after just the first day of trial, before Ms. Herzer had the opportunity to present any evidence of her own.  *See In re Advance Health Care Directive of Sumner M. Redstone*, 2016 WL 2620287 (Cal. Super. Ct. May 9, 2016).  The Court explained:  "The Court is finding ***only*** that the 'proceeding

---

[4]   As noted above, Shari is now using this corporate control to attempt a hijacking of CBS and Viacom that is occurring in real time.  *See* William D. Cohan,  *"The Nuclear Option": With CBS Going to Court, Shari Redstone's "Kabuki Theater" Falls Apart*, VANITY FAIR (May 14, 2018), available at https://www.vanityfair.com/news/2018/05/cbs-lawsuit-shari-redstone-viacom-kabuki-theater/.

is not reasonably necessary to protect the interests of the patient.'  Specifically, Herzer cannot be restored as his agent and Redstone is satisfied with the care he is receiving and to be with his family." *Id.* at *5 (quoting Cal. Prob. Code § 4768).  The probate court went to great lengths to make clear that ***it was not issuing a ruling as to any other issue***:  "***In now granting this motion, the Court is not making any ultimate finding related to Redstone's mental capacity, one way or another, or whether he was unduly influenced in revoking the September directive.***"[5] *Id.*

**Second,** after uncovering Defendants' extensive efforts to spy on her and her family through discovery obtained in the probate case, Ms. Herzer filed a civil action in California state court alleging claims for intentional interference with inheritance and invasion of privacy against Defendants.  (Dkt. 61, Ex. 3.)  Defendants Shari Redstone and Korff initially challenged Ms. Herzer's allegations on legal sufficiency, jurisdictional, and constitutional grounds, but subsequently dropped each of those challenges after Ms. Herzer filed a Second Amended Complaint alleging state law claims against Defendants for invasion of privacy.  (*Id.*, Ex. 15.)[6]

**Third**, although the state court dismissed Ms. Herzer's claim for intentional interference with expected inheritance for failing given to exhaust her remedies in probate court, the court expressly instructed Ms. Herzer to re-file her claim as a petition in probate court.  (*See* Dkt. 61, Ex. 13 at 30:10-15 ("My tentative would be to sustain the demurrer here, to allow you . . . to file in probate court"); *id.* at 67:1-5 ("The Court is persuaded that the first cause of action should be brought in the probate

---

[5]    *See, e.g.*, *Advance Health Care Directive*, 2016 WL 2620287 at *5 ("Similarly, the Court is not making any judgment calls about Herzer or Shari's credibility or motives at this time where the Court has not heard all the evidence it would need to make such decisions."), at *5 n.6 ("In order that there be no confusion, the Court is not in this case addressing Redstone's mental capacity for any purposes other than with respect to the health care directive."), at *5 n.7 ("The Court is not now deciding these issues at all."), at *7 n.11 ("As indicated above, however, the Court reaches no final conclusions on these issues.").

[6]    In response, state court actions were filed against Ms. Herzer in California and in New York.  Both actions were filed (purportedly in Sumner's name) to claw back several *inter vivos* gifts Sumner made to Ms. Herzer between 2009 and 2015, including cash gifts and an apartment in New York.  *See* Dkt. 61, Ex. 9 & Ex. 27.)

department under probate code section 17200 rather than as a separate claim for intentional interference with expected inheritance."). Ms. Herzer subsequently complied with the court's order and filed a petition in probate court challenging the validity of the Fortieth Amendment to Sumner's trust. (Dkt. 61, Ex. 20.) Ms. Herzer has since voluntarily dismissed that petition.

In August 2017, pursuant to an order entered in Ms. Herzer's state court civil action compelling Korff to comply with jurisdictional discovery, Korff produced a treasure trove of emails and text messages that exposed the full scope of Defendants' scheme. *See* FAC ¶¶ 210-212. The apparent criminal conduct revealed by Korff's document production went far beyond the scope of the relatively modest invasion of privacy claims then pending in Ms. Herzer's state court civil action. This federal action followed, and is based almost entirely on this discovery.

## B.   Victims of the Unlawful Scheme File Similar Claims

Allegations similar to those made by Ms. Herzer in this lawsuit have been made by several former Viacom executives in lawsuits they filed in Massachusetts and Delaware after Shari Redstone forced their ouster from Viacom in May 2016. *Id.* ¶¶ 23-24, 173, 193. The allegations made by the Viacom executives mirror those made by Ms. Herzer – namely, that Shari Redstone orchestrated a scheme to separate Sumner from his longtime friends and companions, take over his personal life, and gain take control of his media empire. For example, Frederic Salerno, the longtime independent board member of Viacom alleged the following in his Delaware action:

- "Over the last few months, as Mr. Redstone's condition has deteriorated, Shari, whose relationship with her father has been strained and contentious, has inserted herself into a position of control over his affairs. She has taken control of his home, asserted control over his health care providers, obtained his health care proxy, and restricted access to him by all but a carefully selected group of individuals she controls." (Dkt. 61 (Defs.' Joint Request for Judicial Notice), Ex. 6, ¶ 14.)

- "Although these removal attempts at the Trust, NAI and Viacom were purportedly taken directly or indirectly by Mr. Redstone, it is clear they were orchestrated by Shari. In other words . . . the subsequent purported removal of the Viacom directors from the Viacom Board, in no way reflect voluntary or meaningful decision-making by Mr. Redstone. Mr. Redstone would never

7

sanction these actions if he had capacity and was acting free of Shari's undue influence."  (*Id.*, ¶ 22.)

Similarly, Philippe Dauman and George Abrams—also Viacom directors and Sumner's longtime friends of decades—made very similar allegations in a complaint filed in Massachusetts probate court.  (Dkt. 61, Ex. 5, ¶ 8 ("Mr. Redstone is being manipulated by his daughter, Shari. After years of estrangement, she has inserted herself into his home, taken over his life, isolated him from contact with others, and purports to speak for him.").)

On July 28, 2016, a Massachusetts probate court issued a lengthy ruling denying the motions to dismiss and ordering Sumner to sit for an independent medical examination.  *See Dauman v. Redstone*, 2016 WL 4249567 (Mass. Prob. & Fam. Ct. July 28, 2016) (holding that "the claims are factually specific, not merely conclusory or speculative" and "whether Shari's repertoire of influence was flattery, duplicity or something in between is knowable only through discovery or fact-finding").

The Massachusetts probate court also held that Dauman and Abrams' allegations of undue influence by Shari Redstone (which parallel Ms. Herzer's allegations here) had not been adjudicated by the California probate court.  *See id.*, at *39.   The Massachusetts court identified in detail the issues that were "not addressed or not answered by the California health care litigation":

> [T]he California court found that Sumner . . . 'did not trust [Herzer] because he believed she had lied to him and stolen money from him'.  There was no determination [of] how Sumner formed these beliefs and mistrust. . . . [Dauman and Abrams' allegations] demand further analysis of how a physically isolated person in his 90s could have come to a rational conclusion and how he knew rationally he had been lied to and fleeced[.] . . . By limiting its inquiry to the narrow issues constrained by the California probate code in the healthcare litigation, the [California probate] court did not have to flesh out the 'why' question.

> [I]n the California Health Care litigation there was no discussion of what information Sumner relied on, what information was delivered to him, what filters if any were placed on that information before it was presented to Sumner, who assisted Sumner in "understanding" information given to him, whether the information that he relied upon to conclude that he no longer trusted [Herzer] was true or false, and the motivations of the various actors along the way from information initiator to the time it reached Sumner. Nor was there any discussion . . . of what behavior or actions may have

8

constituted influence and if that influence ultimately procured Sumner's conclusion that he no longer trusted [Herzer].

*Id.* at *39-41.  The court concluded by noting that "[t]he California Health Care litigation did not answer, and the Massachusetts Court must know, how Sumner came to distrust the loyalty of the plaintiffs . . . . [and] what information Sumner relied on, who gave it to him, when and how and why." *Id.* at *42.

Within a few weeks of the court's ruling, the parties—including both Defendants—executed a publicly-filed settlement agreement on August 18, 2016.[7]  In exchange for dropping their claims—and also agreeing to illicit non-cooperation provisions prohibiting voluntary cooperation with anyone asserting similar claims (*i.e.*, Ms. Herzer)—the Viacom executives received eye-popping sums.  *See* FAC ¶¶ 23, 173, 193.  The agreement provided Dauman with $58 million for settling his claims related to his ouster, as well as additional bonus compensation that reportedly resulted in a total payment of between $72 and $90 million to Dauman.

## IV.   LEGAL STANDARD

"[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," but rather must only assert sufficient facts to provide the defendant with "fair notice of what the … claim is and the ground upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must merely allege "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). If a reasonable court can draw the necessary inference from the factual materials stated in the complaint, the plausibility standard has been satisfied. *Schlegel v. Wells Fargo Bank, N.A.*, 720 F.3d 1204, 1211 (9th Cir. 2013).

---

[7]   The settlement agreement, which was publicly filed with the Securities and Exchange Commission, is attached to exhibit 37 to Defendants' Joint Request for Judicial Notice (Dkt. 61, at p. 925), and is also available online at https://www.sec.gov/Archives/edgar/data/1339947/000119312516687817/d244527dex10.htm/.

# V.   ARGUMENT

## A.   Ms. Herzer Has Standing Under the RICO Act

To have standing under the RICO Act, a plaintiff must establish that he or she suffered a cognizable injury, and that such an injury occurred "by reason of" an alleged RICO violation. *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 972 (9th Cir. 2008). An injury is cognizable under RICO if it constitutes "harm to a specific business or property interest," as determined under principles of state law. *Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005) (en banc), *cert. denied*, 546 U.S. 1131 (2006). "In the RICO context, '[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support a claim.'" *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1168 (9th Cir. 2002) (quoting *NOW v. Scheidler*, 510 U.S. 249, 256 (1994)).

In their respective motions, Defendants argue that Ms. Herzer's allegations regarding her removal from Sumner's estate plan, as well as her legal expenses incurred in defending herself in frivolous litigation being improperly prosecuted at Defendants' direction, are categorically not the type of injuries contemplated by the RICO Act. *See* Dkt. 56 at 10-13; Dkt. 60 at 7-11. Defendants further argue that even if such injuries were cognizable under the RICO Act—which, as explained below, they are—the FAC still fails to establish that Ms. Herzer's injuries were proximately caused by Defendants' unlawful conduct. *Id.*

As explained below, however, Herzer's injuries are cognizable. Numerous courts have held that the types of injuries alleged by Ms. Herzer are exactly the type of injuries that confer standing under RICO. Moreover, Ms. Herzer has sufficiently alleged how her injuries were proximately caused by Defendants' unlawful conduct.

### 1.   Interference with An Expected Inheritance Constitutes a Cognizable Injury Under the RICO Act

Defendants argue that a beneficiary of a trust never has standing to assert a

10

1    RICO cause of action because their property interest in the trust merely entitles them

2    to a future benefit, and is therefore not a sufficiently present interest.  *See* Dkt. 56 at

3    10-11; Dkt. 60 at 7-10.  The Ninth Circuit has held, however, that interfering with a

4    person's legal entitlement to receive a future benefit may still constitute an injury

5    sufficient to confer RICO standing.  *See Diaz v. Gates*, 420 F.3d at 900.  Moreover,

6    several courts have specifically recognized that a plaintiff has standing to assert a

7    RICO claim when a defendant intentionally interferes with the plaintiff's legal

8    entitlement to receive a gift or inheritance in the future.  *See, e.g.*, *King v. Wang*, 2015

9    WL 4207076, *5 (S.D.N.Y. July 13, 2015); *Finch v. Finch*, 2009 WL 310776, at *4

10   (S.D. Ill. Feb. 9, 2009).  Accordingly, although Ms. Herzer's property interest in the

11   trust may entitle her to a future benefit, Defendants' efforts to interfere with that legal

12   entitlement gives rise to an injury that is cognizable under the RICO Act.

13       *Diaz v. Gates* is instructive here.  In *Diaz*, the Ninth Circuit held that a plaintiff

14   who had been wrongfully detained had adequately alleged an "injury to business or

15   property" sufficient to confer RICO standing.  *Id.* at 902.  The Ninth Circuit had

16   already held in a prior case that parties have a "legal entitlement to business relations

17   unhampered by schemes prohibited by the RICO predicate statutes."  *Id.* at 899.  The

18   court explained that because the plaintiff had been prevented from finding

19   employment during the period of his wrongful detention, he had suffered harm

20   amounting to interference with ***prospective*** business relations.  *Id.* at 900.  The court

21   held that the distinction between present employment and future employment was

22   irrelevant to determining standing under the RICO Act because that ***interference with***

23   ***either a present or a future interest constitutes a cognizable injury***.  *Id.* at 900-01

24   ("California law protects the legal entitlement to both current and prospective

25   contractual relations. There may be a practical difference between current and future

26   employment for purposes of RICO . . . but this difference is not relevant to whether

27   there was an injury to 'business or property.'").

28       Herzer's claims here are no different.   California law also recognizes an

---

11

individual's legal entitlement to be free from interference with an expected inheritance. *See Beckwith v. Dahl*, 205 Cal. App. 4th 1039 (2012) (recognizing the tort of intentional interference with expected inheritance). Like the California claim for interference with prospective business relations considered by the Ninth Circuit in *Diaz v. Gates*, this claim focuses on potential ***prospective*** harm that has been caused by misconduct under the RICO Act. *Diaz*, 420 F.3d at 900 ("The harms he alleges amount to intentional interference with contract and interference with prospective business relations, both of which are established torts under California law."). Applying the holding of *Diaz* here, Ms. Herzer's injury allegations are legally sufficient as Ms. Herzer suffered injury to her expected inheritance based on conduct that amounts to an established tort under California law.

Other federal courts have adopted this reasoning and have frequently entertained RICO claims involving very similar allegations of unlawful schemes devised to interfere with the plaintiffs' expected inheritances. For example, in *King v. Wang*, 2015 WL 4207076 (S.D.N.Y. July 13, 2015), a famed art collector's daughter and son-in-law asserted a RICO claim against the art collector's son and grandson. The plaintiffs alleged that the defendants had taken advantage of the art collector's declining health to embezzle paintings and to execute a fraudulent will that purported to disinherit the plaintiffs. *Id.* at *2. While probate proceedings remained pending in state court, the plaintiffs filed a RICO claim in federal court "based on allegations that Defendants engaged in an 'ambitious scheme designed to change C.C. Wang's financial affairs and long standing estate plan' in order to facilitate the diversion of family assets away from Plaintiffs and into Defendants' hands.'" *Id.* The district court held, "[t]o the extent, therefore, that Plaintiffs' RICO claims seek damages from Defendants personally on the ground that their conduct prevented Plaintiffs from receiving an expected gift or inheritance, ***they are exactly the type of probate-related claims that Marshall permits federal courts to address.***" *Id.* at *5 (citing *Marshall v. Marshall*, 547 U.S. 293, 304 (2006)) (emphasis added). Although the district court

12

dismissed the complaint on other grounds, the Second Circuit reversed and reinstated the plaintiffs' RICO claim after finding that the plaintiffs' allegations established each of the elements necessary to plead a violation.  *See King v. Wang*, 663 Fed. App'x 12, 14 (2d Cir. 2016) ("the RICO claims raised here 'are exactly the type of probate-related claims that *Marshall* permits federal courts to address.'").

Likewise, in *Finch v. Finch*, No. 08-cv-408-JPG, 2009 WL 310776 (S.D. Ill. Feb. 9, 2009), the district court declined to dismiss a RICO claim where the complaint alleged that the defendants used unlawful means to prevent the plaintiffs from receiving gifts promised to them by the decedent.  Specifically, the plaintiffs alleged that the attorneys of the deceased trust settlor had wrongfully amended his trust for their own benefit, including by "prepar[ing] and forg[ing] trust documents" to amend the settlor's trust, "prepar[ing] and forg[ing] Edwin's will," "obtain[ing] false witness statements," and "forg[ing] Edwin's signature."  *Id.* at *2.  The district court addressed and rejected the defendants' argument that the improper amendment to the trust could not constitute a sufficient injury to confer standing under RICO:

> Here, the plaintiffs' injury is direct, and he has standing to sue as a beneficiary of the [revocable] Trust. [Plaintiffs] were entitled to certain sums under the original Trust document. . . . Under the Trust Amendment, [plaintiffs] are no longer entitled to those payments. . . . ***This is sufficiently direct injury to support standing to bring this civil RICO claim.***

*Id.* at *4 (emphasis added).  The district court also distinguished another case involving an estate dispute in which the RICO claim was dismissed because "[t]hat case involved injury to a decedent and her estate, not injury to the beneficiaries of the decedent's estate directly."  *Id.* at *3 n.2 (citing *Firestone v. Galbreath*, 747 F. Supp. 1556 (S.D. Ohio 1990) (denying motion to dismiss estate's RICO claims)).

By contrast, none of the cases Defendants cite support the proposition that a trust beneficiary does not have standing under the RICO Act when their expectation to receive a future benefit is intentionally interfered with by others.  Indeed, that is because none of Defendants' cases involve situations where the defendants tortiously interfered with the plaintiff's legal entitlement to receive an inheritance.  Instead,

Defendants' cases all stand for the unremarkable proposition that trust beneficiaries do not have standing to bring RICO claims based only on harm to the value of the trust assets that the beneficiaries may one day inherit.  *See Summerfield v. Strategic Lending Corp.*, 2010 WL 3743897 (N.D. Cal. Sept. 20, 2010).

In *Summerfield*, the defendants were alleged to have victimized the plaintiff's parents in a predatory lending scheme that diminished the assets held by the parents' trust.  *Id.* at \*1.  The district court held that a son did not have standing to assert RICO claims based on his status as a beneficiary of his parents' revocable trust.  *Id.* at \*4.  The Sixth Circuit held similarly in *Firestone v. Galbreath* that grandchildren did not have standing to assert a RICO claim based on the depletion of their grandmother's assets.  976 F.2 279, 285 (6th Cir. 1992) ("[Plaintiffs] allege[d] that by stealing from their grandmother during her lifetime, the defendants decreased the size of [her] estate, and consequently the size of their inheritance.").  These cases are clearly inapposite because Ms. Herzer is not alleging that Defendants did anything to harm the value of the assets held by the trust.  To the contrary, Ms. Herzer is complaining that Defendants interfered with ***her*** entitlements relating to the trust.

## 2.    Attorney's Fees Incurred by Reason of Defendants' Unlawful Conduct Also Constitutes a Cognizable Injury

Ms. Herzer's allegations regarding attorneys' fees are also sufficient to establish standing under RICO.  Several circuit courts recognize that attorneys' fees can constitute a cognizable RICO injury.  *See, e.g.*, *Handeen v. Lemaire*, 112 F.3d 1339, 1354 (8th Cir. 1997) (legal expenses qualify as injury to business or property); *Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1166-67 (2d Cir. 1993) ("[L]egal fees may constitute RICO damages when they are proximately caused by a RICO violation.").  The Ninth Circuit, however, has yet to decide the issue one way or another.  *See Thomas v. Baca*, 308 Fed. App'x 87, 88 (9th Cir. 2009).

Plaintiffs have been found to have standing where they alleged they had incurred attorneys' fees as a result of the defendants' RICO violations.  For example,

in *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096 (2d Cir. 1988), the Second Circuit held that the plaintiff had standing where it had alleged that it had incurred legal fees defending against "frivolous lawsuits" that the defendants had initiated and then corrupted by bribing a judge. *Id.* at 1105. Similarly, in *Burger v. Kuimelis*, 325 F. Supp. 2d 1026, 1035-36 (N.D. Cal. 2004), the district court held that the plaintiff had standing where he alleged that the defendants had caused a HUD investigation to be initiated against the plaintiff. Although the plaintiff "was not the direct object of the alleged RICO predicate acts," the court still found that the defendants "tied [plaintiff] and his business and property to the RICO scheme in such a way that harm to [plaintiff] was foreseeable" such that the plaintiff had standing to assert his RICO claims. *Id.* at 1035. Other courts in this district have held similarly.[8]

Finally, contrary to Defendants' assertions, the fact that the elder abuse action is still pending in state court is irrelevant. Ms. Herzer has alleged that she has already incurred millions of dollars in attorneys' fees as a result of Defendants' unlawful conduct. *See Menjivar v. Trophy Props. IV DE, LLC*, 2006 WL 2884396 (N.D. Cal. Oct. 10, 2016) (holding that "for legal fees to suffice as RICO damages, they must, at the very least, have been incurred prior to the current litigation").

### 3. Ms. Herzer Has Adequately Alleged That Her Injuries Were Proximately Caused by Defendants' Unlawful Conduct

Ms. Herzer's allegations sufficiently plead that she was removed from

---

[8]  *See e.g. Dunmore v. Dunmore*, 2013 WL 5569979 (E.D. Cal. Oct. 9, 2013) (holding that legal fees confer standing when they are "directly linked to the illegal conduct of the defendants that constitutes the RICO violations"); *Lauter v. Anoufrieva*, 642 F. Supp. 2d 1060, 1085 n.33 (C.D. Cal. 2009) ("Attorneys' fees and legal expenses incurred in other proceedings which are proximately caused by a RICO defendant's wrongful conduct may be cognizable injuries under RICO.").

Defendants also cite to a district court order that rejected the plaintiff's incurment of attorneys' fees as a basis for standing. (Dkt. 56 at 12 (citing *Ogden v. Wells Fargo Bank, N.A.*, 2015 WL 13413390, at *2 (C.D. Cal. Feb. 20, 2015); Dkt. 60 at 11 (same)). Initially, that case acknowledged that the Ninth Circuit had no blanket rule on this issue. *Id.* More importantly, Defendants neglect to mention that on appeal of that case, the Ninth Circuit entirely ignored the issue of whether attorneys' fees could constitute a cognizable injury under RICO. Instead the Ninth Circuit affirmed the district court's ruling on grounds completely unrelated to standing. *See Ogden v. Wells Fargo Bank, N.A.*, 674 Fed. App'x 650, 651 (9th Cir. 2017).

Sumner's estate plan and forced to incur attorneys' fees "by reason of" Defendants' unlawful conduct.  The "'by reason of' standard incorporates a proximate cause standard, which is which is generous enough to include the unintended, though foreseeable, consequences of RICO predicate acts." *Diaz v. Gates*, 420 F.3d at 901. At this early pleading stage of the case, Ms. Herzer is not required to prove proximate causation. *See e.g.*, *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1168 (9th Cir. 2002) ("In the RICO context, at the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice."); *Lauter v. Anoufrieva*, 642 F. Supp. 2d at 1085 n.33 ("[A]s plaintiff alleges that defendants proximately caused the prosecution . . . the court cannot, at this juncture, conclude as a matter of law that defendants did not proximately cause plaintiff to incur the legal fees and expenses attendant to defending against such action.").

Here, the FAC adequately explains how Defendants caused Ms. Herzer to incur attorneys' fees defending against the elder abuse action including by, *inter alia*, manufacturing a fake record to support the malicious filing of an elder abuse complaint against Ms. Herzer, retaining the same attorneys as Sumner and sending fraudulent communications to authorize the filing of the lawsuit, and bribing witness to prevent them from voluntarily cooperating with Ms. Herzer in her defense of that lawsuit.  *See* FAC ¶¶ 7, 25, 99, 173-181, 193.  For years prior to its filing, Defendants secretly discussed how to file such an elder abuse claim against Ms. Herzer, even though they regularly acknowledged the lack of substantive merit or justification for such a lawsuit.  *See, e.g.* FAC ¶ 72 ("We would not win a lawsuit to get rid of S[ydney Holland] and M[anuela Herzer]. And that would not necessarily be the right thing to do. . . . "[A]ll he kept saying was leave Sydney and Manuella [sic] alone. he said it 100 times"); *id.* ¶ 75 ("[Y]our grandfather . . . could not go to any stronger lengths to [e]nsure that we are all left with nothing and that his little sluts get it all with no interference by us. . . . He is not a puppet.").  Indeed, despite numerous requests made by Sumner that she promise not to sue Ms. Herzer after his death, Shari Redstone

HERZER'S OPPOSITION TO DEFENDANT SHARI REDSTONE'S MOTION TO DISMISS THE FAC

1   vowed to sue Ms. Herzer anyways.  *See* FAC ¶ 73 ("[W]hy would I ever give
2   [Sumner] his dying wish of peace when he never gave me any peace during my whole
3   life . . . Going after these [women] will give me peace[.]"); *id.* ¶ 114 (stating that she
4   would refuse to "sign releases against the whores who will be grieving [his] loss.").

5        After Defendants evicted Ms. Herzer and assumed total control of Sumner's
6   personal and business affairs, Shari Redstone then hired the same attorneys to
7   represent both her and Sumner and to file an elder abuse claim against Ms. Herzer.  *Id.*
8   ¶¶ 174, 177.[9]  Korff spent hundreds of hours working with his and Shari Redstone's
9   attorneys to craft a false narrative that would serve as the purported factual basis for
10  the elder abuse complaint.  *Id.* ¶¶ 11, 112, 115-121, 195.  For example, the FAC
11  includes a communication from Korff made almost ***two years*** before the elder abuse
12  complaint was filed in which Korff cautions his siblings to avoid making written
13  statements that could be used to "impeach[]" them in depositions in which they
14  planned to falsely testify against Ms. Herzer.  *Id.* ¶ 121.

15       The FAC also alleges that Defendants corruptly induced witnesses, including
16  Sumner's nurses, through the payment of bribes concealed as payments for attorneys'
17  fees and settlements of sham employment claims, to sign settlement agreements in
18  which the witnesses promised to not voluntary cooperate with anyone (*i.e.*, Ms.
19  Herzer) involved in litigation with Shari Redstone or her children.  *See id.* ¶ 193.
20  These agreements, which form the basis of Ms. Herzer's allegations of improper
21  witness bribery and tampering, foreseeably increased Ms. Herzer legal expenses given
22  that they forced her to subpoena and depose witnesses who, absent the illegal
23  agreements, would have voluntarily cooperated with Herzer.  *See Bankers Trust Co. v.*

24

25  _____

26  [9]   Notably, these same allegations were made by Dauman, Abrams and Salerno
    after being told that Sumner had purportedly removed them from their respective
27  positions and stated that he never wanted to speak with them again.  *See, e.g.*, FAC ¶
    159 ("These steps are illegal and invalid. They are a shameful effort by Shari
28  Redstone to seize control by unlawfully using her ailing father Sumner Redstone's
    name and signature."), *id.* ¶ 160 ("The Sumner Redstone I knew would never have
    taken this action. What is going on now is unsettling and sad.").

HERZER'S OPPOSITION TO DEFENDANT SHARI REDSTONE'S MOTION TO DISMISS THE FAC

*Rhoades*, 859 F.2d at 1105 (holding that RICO plaintiff had standing based on "legal fees and other expenses incurred . . . in overcoming bribe-induced decisions"). Similarly, the FAC also alleges that Defendants engaged in commercial bribery of Sumner's nurses and household staff in order to enlist their cooperation with the prosecution of the elder abuse action filed against Ms. Herzer. *E.g.*, FAC ¶ 99.

### 4. Herzer's Injuries Are Not "Too Remote"

Defendants further argue that Ms. Herzer's injuries, even if cognizable, are too speculative to allow recovery under RICO. (Dkt. 56 at 18-21; Dkt. 60 at 11 n.6.) The Ninth Circuit "focus[es] on three nonexhaustive factors in considering causation, that is[,] whether the injury is 'too remote' to allow recovery":

> (1) whether there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general; (2) whether it will be difficult to ascertain the amount of the plaintiff's damages attributable to defendant's wrongful conduct; and (3) whether the courts will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries.

*Mendoza v. Zirkle Fruit Co*., 301 F.3d at 1169 (*quoting Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc*., 241 F.3d 696, 701 (9th Cir. 2001)).

Because each of these factors weigh in Ms. Herzer's favor, Ms. Herzer's alleged injuries are not so causally remote that they bar recovery. First, there are not any "more direct victims" who could vindicate the law here given that Defendants have entered into settlements with the other victims of Defendants' scheme, including Dauman, Abrams, Salerno and others. Second, it will not be difficult to ascertain the amount of damages she is entitled to for being removed from Sumner's estate plan or for incurring attorneys' fees in defending against the actions being fraudulently prosecuted in Sumner's name. Third, the risk of multiple recoveries is low. In the event Ms. Herzer is awarded attorneys' fees in the state court proceedings, the amount of such an award could simply be subtracted from the total amount incurred by Ms. Herzer. And as Defendants will surely file motions contending that Ms. Herzer is not entitled to these types of damages in the pending state court action, Ms. Herzer's

1    allegations of these damages here is appropriate at this juncture.

2        **B.    Ms. Herzer's Defamation Claim Is Not Time-Barred**

3        Both Defendants argue that Ms. Herzer's defamation claim is barred by the one-

4    year statute of limitations.  They argue that Ms. Herzer's complaint for invasion of

5    privacy, filed in May 2016, reveals that Ms. Herzer had full knowledge of the specific

6    defamatory statements that had been made and therefore cannot invoke the discovery

7    rule to toll the statute of limitations past May 2017.

8        Defendants' arguments are fundamentally flawed.  As the FAC makes clear,

9    Ms. Herzer only learned about a large number of defamatory statements that

10   Defendant Korff had made when he produced a large number of his emails and text

11   messages pursuant to a court order in August 2017.  For example, in September 2014,

12   Korff inundated Sumner's attorneys with falsehoods claiming that Ms. Herzer

13   regularly forced Sumner to make certain statements to his attorneys and verbally

14   abused him otherwise.  FAC ¶¶ 81-82.  Prior to that document production, Ms. Herzer

15   had no way to know that these defamatory statements had been made about her.

16       Defendants' argument that Ms. Herzer's state court allegations show that she

17   had general knowledge of the defamatory statements is flat wrong.  To plead a claim

18   for defamation under California law, a plaintiff must identify the ***specific*** statements

19   alleged to be defamatory.  *See Kahn v. Bower*, 232 Cal.App.3d 1599, 1612 n.5 (1991)

20   ("The general rule is that the words constituting an alleged libel must be specifically

21   identified, if not pleaded verbatim, in the complaint.").  Defendants offer no

22   explanation for how Ms. Herzer could have pled the specific statements she alleges to

23   be defamatory prior to receiving Korff's documents in August 2017.  Accordingly,

24   since the statute of limitations only began running in August 2017, Ms. Herzer's

25   defamation claim cannot be barred by the one-year statute of limitations.

26

27

28

## C.   Abstention Is Not Warranted

### 1.   There Are No "Exceptional Circumstances" to Justify a Stay or Dismissal Under *Colorado River*

In recognition of the fact that Ms. Herzer's claims are adequately pled, Defendants make a last-ditch attempt to seek a stay or dismissal of this case under the *Colorado River* abstention doctrine.  (Dkt. 60 at 19; *see* Dkt. 56 at 10 n.3.).  But given their failure to identify any type of "exceptional circumstances" that would warrant abstention, Defendants' request to stay or dismiss this case under *Colorado River* should be denied.  *See New Orleans Pub. Serv., Inc., v. Council of City of New Orleans*, 491 U.S. 350, 368 (2013) ("Only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States.").[10]

When a federal plaintiff has filed a prior action in state court, "*Colorado River* sets out the appropriate standard under which to examine whether or not to dismiss (or stay) her allegedly duplicative federal claims."  *Kanciper*, 722 F.3d at 93.  As Defendants admit, "[t]he pendency of an action in state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction."  (*See* Dkt. 60 at 19 (quoting *Colo. River*, 424 U.S. at 817)).  This difference in general approach between state-federal concurrent jurisdiction and wholly federal concurrent jurisdiction stems from the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them."  *Colo. River*, 424 U.S. at 817; *Sprint Commc'ns*, 571 U.S. at 77 ("Parallel state-court proceedings do not detract from that obligation.").

The Eleventh Circuit's decision in *Glickstein v. Sun Bank/Miami, N.A.* is

---

[10]  "Abstention from the exercise of federal jurisdiction is the exception, not the rule."  *Seneca Ins. Co., Inc. v. Strange Land, Inc.*, 862 F.3d 835, 841 (9th Cir. 2017) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976).  The Supreme Court has explained that "the task is to ascertain whether there exist 'exceptional' circumstances, the 'clearest of justifications,' that can suffice under *Colorado River* to justify the surrender of that jurisdiction."  *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25-26 (1983); *see Jimenez v. Rodriguez-Pagan*, 597 F.3d 18, 27 (1st Cir. 2010) ("The crevice in federal jurisdiction that *Colorado River* carved is a narrow one. Of all the abstention doctrines, it is to be approached with the most caution . . . .").

instructive, as that case involved a similar factual and procedural posture.  922 F.2d 666 (11th Cir. 1991).  There, the plaintiffs filed a federal action alleging claims under RICO to recover attorneys' fees they had incurred in connection with pending state probate court proceedings in which the defendants had been found to have unduly influenced a mentally-enfeebled testator into executing a will.  *Id.* at 674.  The district court granted the defendants' request to enter an abstention order given the pending state court proceedings.  *Id.*  The Eleventh Circuit reversed, explaining that "[t]he fact that a similar action is pending in a state court does not mean that the federal court should abstain from deciding the case."  *Id.* at 675.  The court held that the defendants had failed to put forth any reason warranting a stay or dismissal of the RICO action "pending the completion of the state probate proceedings where plaintiff has made many of the same allegations set forth in her complaint in this action."  *Id.* (quoting *Gunther v. Dinger*, 547 F. Supp. 25 (S.D.N.Y. 1982)).  The Eleventh Circuit reiterated the general maxim that "[w]hen concurrent jurisdiction exists, plaintiffs' choices between state and federal forums usually control."  *Id.*

## 2.   The *Colorado River* Factors Weigh in Favor of Jurisdiction

Although abstention is never warranted absent "exceptional circumstances," Defendants' cursory and flawed application of the so-called *Colorado River* factors still warrants a response.  (Dkt. 56 at 19-25.)  The Ninth Circuit "evaluate[s] eight factors in assessing the appropriateness of a Colorado River stay or dismissal:

> (1) which court first assumed jurisdiction over any property at stake; (2) the inconvenience of the federal forum; (3) the desire to avoid piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether federal law or state law provides the rule of decision on the merits; (6) whether the state court proceedings can adequately protect the rights of the federal litigants; (7) the desire to avoid forum shopping; and (8) whether the state court proceedings will resolve all issues before the federal court.

*Seneca Ins. Co., Inc.*, 862 F.3d at 841-42 (quoting *R.R. St. & Co. v. Transp. Ins. Co.*, 656 F.3d 966, 978-79 (9th Cir. 2011)).  Courts "must carefully balance the important factors, 'with the balance heavily weighted in favor of the exercise of jurisdiction.'" *Id.* at 842.  "Any doubt as to whether a factor exists should be resolved against a stay,

not in favor of one." *Travelers Indem. Co. v. Madonna*, 914 F.2d 1364, 1369 (9th Cir. 1990).  Because several, even if not all, of the factors enumerated above clearly weigh in favor of the exercise of jurisdiction, abstention is not warranted.

    ***Jurisdiction Over a Res***.  Although Defendants suggest otherwise, this action does not call for the Court to exercise *in rem* jurisdiction over any property.  The FAC does not request the Court to make "[a]ny disposition of property." *Montanore Minerals Corp. v. Bakie*, 67 F.3d 1160, 1166 (9th Cir. 2017).  Nor does it require this Court to interfere with the probate court's administration of Sumner's trust.  Rather, the FAC simply requests that damages be awarded based on Defendants' unlawful conduct to interfere with her expected inheritance and force her to incur attorneys' fees to defend against an unjustified lawsuit.  As already discussed above, federal courts may exercise over jurisdiction over RICO claims even when related probate proceedings remain pending. *See King v. Wang*, 663 Fed. App'x 12, 14 (2d Cir. 2016) ("We agree with the district court that the RICO claims raised here are exactly the type of probate-related claims that *Marshall* permits federal courts to address.").

    ***Inconvenience of the Federal Forum***.  Defendants declined to discuss this factor despite its clear relevance.  Far from being an inconvenient forum, the federal court is actually a far more convenient forum given that it has nationwide subpoena power.  Both Defendants and many of the relevant witnesses reside outside of California with many of the more-recent corporate maneuvers involving CBS and Viacom occurring on the East Coast.  Consequently, the parties in the state court proceedings have had to expend considerable resources to follow arcane and unwieldy procedures for obtaining out-of-state discovery, including instituting new proceedings in other states simply for the purpose of obtaining discovery.  That is yet another reason Ms. Herzer has sought to litigate this case in federal court where she will be able to obtain out-of-state discovery from Defendants far more efficiently.

    ***Avoiding Piecemeal Litigation.***  In their cursory analysis of this factor, Defendants continue to beat the same drum by arguing that "Herzer's federal claims

22

1   are subsumed by her state law claims." (Dkt. 56 at 23.)  Defendants' assertion is

2   demonstrably false, however, as Ms. Herzer's invasion of privacy claims are based on

3   a far more limited set of facts than her federal claims arising out of fraud, bribery and

4   defamation.  Moreover, Ms. Herzer's invasion of privacy claims involve entirely

5   different legal issues than Ms. Herzer's federal claims, given that there is ***absolutely***

6   ***no overlap*** between the elements of the invasion of privacy claims and the claims

7   asserted in this action.[11]  Indeed, Judge Hess has already indicated that Ms. Herzer's

8   causes of action for invasion of privacy do not entitle her to recover damages related

9   to Defendants' interference with her inheritance.[12]  (*See* Dkt. 61, Ex. 13 at 67-68.)

10  Thus, regardless of whether Ms. Herzer can establish her invasion of privacy claims,

11  additional litigation would still be required to determine whether she can establish her

12  claims for violations of the RICO Act, the ECPA and state law.

13          ***Order In Which the Forums Gained Jurisdiction***.  Although Defendants argue

14  that "this factor weighs heavily in [their] favor," a closer examination reveals a

15  different reality.  "In determining the order in which the state and federal courts

16  obtained jurisdiction, district courts are instructed not simply to compare filing dates,

17  but to analyze the progress made in each case 'in a pragmatic, flexible manner with a

18  view to the realities of the case at hand.'" *Seneca*, 862 F.3d at 843.

19          This Court obtained jurisdiction only approximately one month after the state

20  court obtained jurisdiction over Defendant Korff.  On January 26, 2018, Korff

21

22  [11]  An invasion of privacy claim under California law requires a plaintiff to establish
    an "(1) intrusion into a private place, conversation or matter, (2) in a manner highly
23  offensive to a reasonable person." *Shulman v. Group W Prods., Inc.*, 18 Cal. 4th
    200, 231 (1998).  To prevail, a "plaintiff must show the defendant penetrated some
24  zone of physical or sensory privacy surrounding, or obtained unwanted access to
    data about, the plaintiff." *Id.*
25  [12]  Shari Redstone served an interrogatory on Ms. Herzer in the state court action
    requesting that she identify "any other damages that [Herzer] attribute[s] to the
26  [intrusion upon her privacy]."  Walsh Decl., Ex. 2 at 3.  While Ms. Herzer
    responded by identifying several different categories of damages, the state court has
27  held that her invasion of privacy claims ***do not*** entitle her to recover the full scope of
    those damages.  *Id.* at 4; 4/21/2017 Hr'g Tr. at 67.  In determining the scope of the
28  primary right at issue, the relevant issue is what damages Ms. Herzer is entitled to
    recover, not what damages Ms. Herzer "attribute[s]" to Defendants' conduct.

withdrew the jurisdictional challenges he had maintained since the filing of Ms. Herzer's state court action and filed his answer.  Korff consented to this Court's jurisdiction just a few weeks later when his counsel entered general appearances in this case on March 1, 2018.  Accordingly, it is not clear why—at least with respect to Korff—Defendants contend this factor weighs "strongly" in their favor.

Defendants' claim that the parties have been engaged in discovery for almost two years is misleading.  The lion's share of the discovery that has been conducted has been in connection with the elder abuse action filed against Ms. Herzer, and not in the case involving Ms. Herzer's privacy claims against Defendants.   Shari Redstone has not completed/only recently completed her document production and her deposition is still not even scheduled (and according to a May 30, 2018 e-mail from her counsel, should not occur until the latter half of August or September, at the earliest).   Until Korff recently withdrew his jurisdictional challenges, Ms. Herzer was expressly forbidden from seeking discovery from Korff on any substantive issues; Ms. Herzer has not obtained ***any*** non-jurisdictional, substantive discovery from Korff.

***Whether State or Federal Law Provides the Rule of Decision.***  This factor weighs unquestionably in favor of the exercise of jurisdiction given that two of Ms. Herzer's three claims are governed by federal law.  "The presence of federal-law issues must always be a major consideration weighing ***against*** surrender of jurisdiction." *Seneca*, 862 F.3d at 844 (emphasis in original).  "Cases implicating only "routine issues of state law—misrepresentation, breach of fiduciary duty, and breach of contract—which the district court is fully capable of deciding" do not entail 'rare circumstances' counseling in favor of abstention." *Id.*  Defendants' attempt to downplay the import of this factor is unavailing.  While it may be true that this factor has less relevance where the "federal claims are based entirely on the same facts, circumstances and elements of proof and defense as [the] state law claims," that is simply not the case here.  As discussed above, Ms. Herzer's privacy claims involve entirely different factual and legal issues than her RICO, ECPA and state law claims.

24

***Whether the state court proceedings can adequately protect the rights of the federal litigants***.  Again, this factor weigh in favor of the exercise of jurisdiction because the state court proceedings involve far more narrow issues than this federal action.  As such, the Ninth Circuit's holding in *Montanore* is clearly distinguishable.  In contrast to the circumstances present here, the Ninth Circuit explained in *Montanore* that the "federal action is but a spin-off of ***more comprehensive state litigation***."  867 F.3d at 1166.  The federal action here involves far more comprehensive allegations that go beyond the simple invasions of privacy alleged in the Herzer's state court action.  *See Seneca*, 862 F.3d at 845 ("[D]oubt as to whether the state proceedings will resolve the federal action precludes a ... stay or dismissal.").

***Desire to Avoid Forum Shopping.***  Although Defendants accuse Ms. Herzer of forum shopping, there is nothing to substantiate those charges.  *See, e.g.*, *Seneca*, 862 F.3d at 846 ("It typically does not constitute forum shopping where a party acted within his rights in filing a suit in the forum of his choice, even where the chronology of events suggests that both parties took a somewhat opportunistic approach to the litigation."); *R.R. St.*, 656 F.3d at 982 ("[W]e are cautious about labeling as 'forum shopping' a plaintiff's desire to bring previously unasserted claims in federal court.").

Defendants have failed to identify any adverse ruling or rules applicable in state court that would support the notion that federal court presents a more favorable forum.  *See Seneca*, 862 F.3d at 846 ("When evaluating forum shopping under *Colorado River*, we consider whether either party improperly sought more favorable rules in its choice of forum or pursued suit in a new forum after facing setbacks in the original proceeding.").  To the contrary, Ms. Herzer has not suffered any setbacks in the state court actions and continues to pursue her claims and defenses there aggressively.

## VI.   CONCLUSION

For the foregoing reasons, Ms. Herzer respectfully requests that Defendants' Motions to Dismiss be denied.  If the Court is inclined to grant Defendants' motions, Ms. Herzer respectfully requests that leave to amend be granted.

DATED:  June 4, 2018

Respectfully submitted,

WINSTON & STRAWN LLP

By:      /s/ Dan K. Webb
_____
Dan K. Webb
Attorneys for Plaintiff Manuela Herzer

BIRD, MARELLA, BOXER, WOLPERT, NESSIM, DROOKS, LINCENBERG & RHOW, P.C.

By:      /s/ Ekwan E. Rhow
_____
Ekwan E. Rhow
Attorneys for Plaintiff Manuela Herzer

LAW OFFICES OF RONALD RICHARDS AND ASSOCIATES, A.P.C.

By:      /s/ Ronald Richards
_____
Ronald Richards
Attorneys for Plaintiff Manuela Herzer

26